**In re CIS CORPORATION, Continental Information Systems Corporation, et al., Debtors.**

**James P. HASSETT, as Trustee of Continental Information Systems Corporation, et al., Plaintiffs,**

v.

**Harry E. GOETZMANN, Jr., Defendant.**

**Bankruptcy Nos. 89–B–10073 (PBA) to 89–B–10084 (PBA). Adv. No. 90–6011A.**

United States Bankruptcy Court, S.D. New York.

April 15, 1996.

As corrected May 2, 1996.

**252**

Langan Grossman Kinney Dwyer & Reitz, P.C. by Richard D. Grossman, Susan Johns, East Syracuse, NY, for Harry E. Goetzmann, Jr.

Wilmer, Cutler & Pickering by Stephen Black, Ross Albert, Washington, DC, for Chapter 11 Trustee.

### MEMORANDUM DECISION AFTER TRIAL GRANTING JUDGMENT IN FAVOR OF TRUSTEE

PRUDENCE BEATTY ABRAM, Bankruptcy Judge.

This adversary proceeding was commenced by James P. Hassett as Chapter 11 trustee (the "Trustee") of CIS Corporation and its related subsidiaries and affiliates ("CIS" or "Debtors") to recover pre-petition payments of $364,791 made to or for the benefit of Harry E. Goetzmann, Jr., the founder and former president of the Debtor, just 2 weeks before he caused Chapter 11 petitions to be filed by the Debtors in January 1989. The payments were in satisfaction of the balance of a $888,279 bonus declared due to Goetzmann in May 1988 based on the Debtors' stated earnings for the year ended December 1987. The Trustee alleged that the payments were preferential transfers that could be recovered pursuant to Bankruptcy Code § 547(b). Goetzmann admitted that the Trustee could satisfy all the elements of Code § 547(b) with the exception of the greater percentage test. However, Goetz-

mann contended that the payments were made in the ordinary course of business and thus under Code § 547(c) could not be recovered.

Following a trial and based upon the court's findings of fact and law which follow, this court grants judgment in favor of the Trustee.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

#### A. Background

1. On January 13, 1989 (the "Filing Date"), the Debtors filed voluntary petitions in this Court under Chapter 11 of the Bankruptcy Code. The Debtors continued in the management and operation of their businesses and properties as debtors-in-possession for a number of months. In early fall of 1989, the Creditors' Committee sought the appointment of a Chapter 11 trustee on the grounds of a number of acts of alleged misconduct and/or mismanagement by the debtors-in-possession. Shortly thereafter when the Debtors determined not to oppose the appointment, this Court ordered the appointment of a Chapter 11 trustee. James P. Hassett was appointed Chapter 11 trustee (the "Trustee") in late October 1989.

2. On the Filing Date, the Defendant Harry E. Goetzmann, Jr. ("Goetzmann" or the "Defendant"), who had founded CIS in 1968, was Chief Executive Officer of CIS.

3. On or about December 30, 1988, CIS made a $364,781 payment (the "Payment") to or for the benefit of Goetzmann. By letter dated March 22, 1990, the Trustee demanded that Goetzmann repay the $364,781 as well as certain additional transfers made by CIS to Goetzmann and to federal and state tax authorities on his behalf.

4. On June 11, 1990, the Trustee filed his Complaint in this adversary proceeding seeking to recover the $364,781 Payment as a preferential transfer as well as certain additional transfers.

5. At a hearing on July 26, 1991, this Court granted the Trustee's motion for partial summary judgment, ruling that the

Payment was a voidable preference and overruling Goetzmann's defenses. The Court memorialized its ruling in a written Order dated September 13, 1991 (the "September 13 Order").

6. Goetzmann appealed from the September 13 Order. In a Memorandum–Decision and Order dated December 22, 1992, the United States District Court for the Southern District of New York (David N. Edelstein, U.S.D.J.) vacated the September 13 Order and remanded the case to this Court for trial.[1]

7. At a hearing on January 8, 1993, this Court struck Goetzmann's jury trial demand and set a trial date of February 25, 1993. Upon the consent of the parties, on January 27, 1993, this Court entered an Order providing that the trial would encompass the Trustee's claims under Code § 547 as to the Payment. These matters were tried before this Court on February 25 and 26, 1993 (the "Trial").

B. *The $364,781 Payment*

8. At all relevant times before October 24, 1989, Goetzmann was the Chairman and Chief Executive Officer of CIS.

9. The CIS fiscal year 1988 ended on February 29, 1988. Under the terms of his fiscal 1988 compensation agreement with CIS, Goetzmann was entitled to receive a bonus amounting to three percent of CIS' net pretax profit.

10. Goetzmann became eligible to receive full payment of his fiscal 1988 bonus of $882,279 on or shortly after May 6, 1988.

11. Later in May 1988, at Goetzmann's request, CIS paid Goetzmann advances totalling $517,498 against his fiscal 1988 bonus: one advance for $500,000 on May 9, 1988 and another advance for $17,498 on May 23, 1988. CIS did not deduct or withhold any amount from these advances for payment of federal or state income taxes because at Goetzmann's request CIS treated the advances as loans.

12. Under applicable federal and state law, an employer is obligated to deduct and withhold income taxes from wages as and when paid, including wages constructively paid. Treas.Reg. § 31.3402(a)–1(b); 20 NYCRR 160.1(b) (current version at 20 NYCRR 171.1(b) (1992)). In 1988, it was CIS' ordinary course of business to withhold income tax payments from wage payments, including bonus payments, to employees in accordance with applicable federal and state law.

13. Sometime prior to December 20, 1988, on at least one occasion, Goetzmann made a verbal request for the balance of his bonus to Thomas Prinzing ("Prinzing"), the Chief Financial Officer of CIS. Prinzing did not issue a check based on Goetzmann's verbal request.

14. On or about December 20, 1988, Goetzmann sent a memorandum (the "December 20th Memorandum") to Prinzing requesting payment of his fiscal 1988 bonus of $882,279. In the December 20th Memorandum, Goetzmann noted the previous advances of $500,000 and $17,498, and stated that the gross balance due him was $364,781. As to the balance, Goetzmann's memorandum directed CIS to deduct and withhold $241,000 for taxes: $193,000 (21.9 percent of Goetzmann's $882,279 fiscal 1988 bonus) for federal taxes and $48,000 (5.4 percent of Goetzmann's fiscal 1988 bonus) for state taxes.

15. On or about December 30, 1988, in accordance with the December 20th Memorandum, CIS paid (1) $123,781 to Goetzmann; (2) $193,000 to the federal taxing authorities and (3) $48,000 to the state taxing authorities.

16. Goetzmann admitted in his Answer to the Complaint that he knew that CIS was insolvent at the time he received the Payment.

17. The Trustee testified at Trial that he undertook several valuation studies of CIS as of the Filing Date through 1992. These studies included reviewing accounts receiv-

---

1. The District Court reversed on the grounds that Goetzmann had raised a genuine issue of material fact with respect to whether it was the normal course of business for CIS to pay a bonus to Goetzmann later than the time at which such payment became due. See District Court decision at 6.

able billing, liabilities, isolating assets to which CIS had clear title, and reviewing major re-marketing agreements. He also testified that he reviewed possible settlements of pending litigation against CIS, including a $150 million claim asserted against CIS by the Internal Revenue Service ("IRS").

18. The Trustee concluded that based on his studies, the unsecured creditors would not receive 100 cents on the dollar in a liquidation of CIS under Chapter 7 of the Code either at the Filing Date or at the time of Trial.

C. *Goetzmann's Knowledge of CIS' Likely Bankruptcy*

19. From July 1988 through the end of November 1988, the price of CIS stock on the New York Stock Exchange declined by approximately 65 percent. Goetzmann, by his own admission, was contemporaneously aware of the magnitude of this decline.

20. On August 22, 1988 CIS consulted Levin & Weintraub & Crames (the "Levin Firm") as bankruptcy counsel.

21. The discussion of CIS' declining financial circumstances dominated the meetings of CIS' Board of Directors and of the Executive Committee of CIS' Board of Directors during the period from September through December 1988. Goetzmann attended and presided at all these meetings.

22. At a meeting on September 28, 1988, Goetzmann and the Board of Directors were informed that CIS was likely to incur a substantial third quarter loss. CIS' outside general counsel, Daniel Bergstein, advised that if CIS was not able to consummate a pending deal with its principal lender Prudential Capital Investments ("Pru–Cap") "the evaluation and posturing relative to an insolvency workout on a worst case basis has been addressed."

23. In the fall of 1988, CIS retained Drexel Burnham Lambert ("Drexel") to assist CIS in acquiring new capital.

24. At a special meeting of the Board of Directors on November 16, 1988, Goetzmann and the Board were informed that third quarter projections would probably not meet the terms set forth in CIS' loan agreement with Pru–Cap. At the same meeting Thomas Prinzing, CIS' Chief Financial Officer, circulated future cash flow projections from November 1988 through February 1989 showing a possible negative cash flow of $28 million and financing needs of an additional $70 million.

25. At a presentation to senior management, including Goetzmann, at CIS' headquarters on or about November 29, 1988, Drexel reported that CIS could not raise additional capital and that CIS should consider soliciting buyers for its business segments.

26. By the end of November 1988, the Levin Firm posted attorney Andrew Kress at CIS' headquarters in Syracuse to review issues related to a potential bankruptcy filing. In December 1988 Goetzmann periodically asked Kress about the Levin Firm's progress towards completion of the 12 bankruptcy petitions that the Debtors would ultimately file on January 13, 1989.

27. At a special meeting of the Executive Committee of the Board of Directors on December 2, 1988, Goetzmann presided over a discussion of the Debtors' rapidly declining financial situation, including Drexel's conclusion that the Debtors' business plan was not feasible. Goetzmann also reported that the Debtors had retained Touche Ross to replace Drexel for restructuring advice and the Levin Firm for advice relating to bankruptcy issues. Goetzmann further advised the Executive Committee that CIS might not be able to make a $4 million payment due Manufacturers National Bank of Detroit on December 15, 1988.

28. At a special meeting of the Board of Directors on December 12, 1988, the Board heard a financial report showing a loss after taxes for September and October and discussed cash flow projections for December through February, showing negative cash flow from operations of $10,485,000. Goetzmann called the Board's attention to the November 29th Drexel presentation which concluded that CIS could not raise additional capital. Daniel Gruber of the Touche Ross restructuring group reported on the services his firm was providing CIS, including an

analysis of CIS' "debtor in possession" financing opportunities. Myron Trepper of the Levin Firm profiled his firm's practice and advised that he had been analyzing the options available to CIS in case of a bankruptcy filing.

29. On or about December 12, 1988, Goetzmann met with Homer Reese, President of Pru–Cap, CIS' principal lender. At the meeting, Reese informed Goetzmann of Pru–Cap's belief that CIS had no reasonable prospects of raising additional capital or achieving a successful reorganization and sought Goetzmann's permission to allow Comdisco, the Debtors' principal competitor in the computer leasing industry, to manage the process of liquidating the Debtors' assets. Goetzmann later stated to counsel to the Trustee that he regarded this meeting with Reese as a "turning point" in the Debtors' efforts to avoid bankruptcy proceedings.

30. Little more than a week later Goetzmann sent his December 20th Memorandum to Prinzing requesting payment of the balance of his fiscal 1988 bonus of $882,279.

31. In mid-December 1988, Trepper of the Levin Firm, the Debtors' bankruptcy counsel, advised Goetzmann that the Debtors' creditors might seek to place the Debtors into involuntary bankruptcy.

32. In December 1988, Goetzmann turned over the conference room adjacent to his office to the outside professionals from the Levin Firm, CS First Boston, and Touche Ross who were working on restructuring and the preparation of bankruptcy petitions for the Debtors. Goetzmann's secretary gave out over a dozen keys and these outside professionals thereafter worked out of this conference room. Goetzmann was contemporaneously aware of the activities of these outside professionals.

33. At a special meeting of the Board of Directors on December 21, 1988, Goetzmann reviewed the Debtors' severe financial difficulties, including the $40 million arrearages to trade creditors, investors, and sublessees; $27 million in payments due on January 31, 1989; and negative cash flow and lack of available bridge financing. Goetzmann advised the Board about the advantages and disadvantages of various alternatives if the banks rejected loan extensions proposed by CIS, including a consolidated Chapter 11 filing by the Debtors. Trepper and Bergstein, CIS' outside general counsel, also extensively discussed the consequences of a bankruptcy filing by CIS.

34. As a result of the circumstances described above, both at the time the December 20 Memorandum was sent and at the time of the Payment on or about December 30th, 1988 Goetzmann knew or reasonably should have known that there was a substantial probability that CIS would soon be in bankruptcy.

D. *CIS' Net Profits Bonuses and Tax Withholding Practices: Fiscal Years 1986 to 1988*

35. In CIS' fiscal year 1988, three CIS employees received annual bonuses tied to CIS' net profits: Goetzmann, who was Chairman and Chief Executive Officer, John L. Bartolo, who was Executive Vice President, and Thomas J. Prinzing, who was Chief Financial Officer. Goetzmann, Bartolo and Prinzing were eligible to receive their fiscal 1988 bonuses at any time on or after May 6, 1988. On or about May 12, 1988, Bartolo and Prinzing received full payment of their fiscal 1988 bonuses in the respective amounts of $588,186 (less a prior advance of $50,000) and $220,570 (less prior advances totalling $45,-000). At the time it paid Bartolo and Prinzing their fiscal 1988 bonuses, CIS withheld amounts for payment of federal and state taxes.

36. CIS' fiscal year 1987 ended on February 28, 1987. In fiscal 1987, Goetzmann, Bartolo and Prinzing were the only CIS employees who received annual bonuses tied to CIS' net profits. On or about May 7, 1987, Goetzmann, Bartolo and Prinzing each received full payment of their fiscal 1987 bonuses in the respective amounts of $827,055, $551,370 and $137,843. At the time it paid Goetzmann the $827,055 bonus, CIS withheld 20 percent or $165,411 for payment of federal taxes and 5 percent or $41,352.75 for payment of state taxes. At the time it paid Bartolo and Prinzing their fiscal 1987 bonus-

es, CIS withheld amounts for payment of federal and state taxes as well.

37. CIS' fiscal year 1986 ended on February 28, 1986. In fiscal 1986, Goetzmann, Bartolo and Prinzing were again the only three CIS employees eligible to receive annual bonuses tied to CIS' net profits. On or about April 29, 1986, Goetzmann and Bartolo received full payment of their fiscal 1986 bonuses in the respective amounts of $670,106 and $446,738. On or about May 1, 1986, Prinzing received full payment of his fiscal 1986 bonus in the amount of $111,685. At the time it paid Goetzmann the $670,106 bonus, CIS withheld 20 percent or $134,021.20 for payment of federal taxes and 5 percent or $33,505.30 for payment of state taxes. At the time it paid Bartolo and Prinzing their fiscal 1986 bonuses, CIS withheld amounts for payment of federal and state taxes as well.

E. *CIS Bonus Payments to Goetzmann and Tax Withholding Practices: Fiscal Years 1974 to 1985*

39. CIS' fiscal year 1985 ended on February 28, 1985. By memorandum dated June 21, 1985, Goetzmann and Bartolo requested payment of their fiscal 1985 bonuses, which totalled $306,681 and $254,636 respectively, in seven equal monthly installments of $43,811.57 and $36,376.57, respectively, starting on June 30, 1985 and ending on December 31, 1985. Goetzmann thereafter received payment of his bonus according to this schedule. At the time it paid the first installment of the $306,681 bonus, CIS deducted and withheld 20 percent of the installment or $8,762.31 for payment of federal taxes and 5 percent or $2,190.58 for payment of state taxes. CIS did not deduct and withhold any amount for payment of federal or state taxes from the next five installments. At the time it paid the last installment, CIS deducted and withheld $3,000 for payment of federal taxes and did not deduct and withhold any amount for payment of state taxes.

40. CIS' fiscal year 1984 ended on May 31, 1984; CIS' fiscal 1983 ended on May 31, 1983. Goetzmann's fiscal 1984 bonus totalled $211,200; his fiscal 1983 bonus totalled $192,000. Goetzmann received full payment of his fiscal 1983 and 1984 bonuses in installments of $296,819 on December 31, 1984 and $106,381 on December 31, 1985. At Goetzmann's direction, CIS did not deduct and withhold any amount from either the $296,819 installment or the $106,381 installment for payment of federal or state taxes.

41. CIS' fiscal year 1982 ended on May 31, 1982; CIS' fiscal 1981 ended on May 31, 1981. Goetzmann's fiscal 1982 bonus totalled $131,980; Goetzmann's fiscal 1981 bonus totalled $23,139. Goetzmann received full payment of his fiscal 1981 and 1982 bonuses in one installment of $155,119 on May 31, 1983. At the time it paid Goetzmann the $155,119 installment, CIS deducted and withheld 20 percent or $31,000 for payment of federal taxes and 10 percent or $15,500 for payment of state taxes.

42. CIS' fiscal year 1980 ended on May 31, 1980. Goetzmann did not receive a bonus for fiscal 1980.

43. CIS' fiscal year 1979 ended on May 31, 1979. Goetzmann did not receive a bonus for fiscal 1979.

44. CIS' fiscal year 1978 ended on May 31, 1978. Goetzmann received full payment of his fiscal 1978 bonus of $78,200 on or about August 15, 1978. At Goetzmann's direction, CIS did not withhold any amount from the $78,200 bonus for payment of federal or state taxes.

45. CIS' fiscal year 1977 ended on May 31, 1977. Goetzmann received full payment of this fiscal 1977 bonus of $12,917.50 on or shortly after August 31, 1977. At Goetzmann's direction, CIS did not deduct and withhold any amount from the $12,917.50 bonus for payment of federal or state taxes.

46. CIS' fiscal year 1976 ended on May 31, 1976. Goetzmann received full payment of his fiscal 1976 bonus of $22,500 on or about June 15, 1976. At the time it paid Goetzmann the $22,500 bonus, CIS deducted and withheld 8 percent or $1,800 for payment of federal taxes and 3.1 percent or $700 for payment of state taxes.

47. CIS' fiscal year 1975 ended on May 31, 1975. Goetzmann received full payment of his fiscal 1975 bonus of $21,835 on or

shortly after June 24, 1975. CIS did not deduct and withhold any amount from the $21,835 bonus for payment of federal or state taxes.

48. CIS' fiscal year 1974 ended on May 31, 1974. Goetzmann received full payment of his fiscal 1974 bonus of $25,000 sometime before September 23, 1974.

49. In sum, from 1974 through 1987, it was the ordinary course of business for CIS to accept Goetzmann's instructions with respect to the amount of any taxes to be deducted and withheld from his annual bonus payment and to deduct and withhold these amounts at the time Goetzmann elected to receive payment of his annual bonus.

50. Prior to the advances totalling $517,-498 that Goetzmann received in May 1988, Goetzmann never received an advance against an annual bonus that already had been declared and was fully vested.

### F. *Lack of Evidence of Computer–Leasing Industry Practices*

51. The only evidence offered by Goetzmann to prove that the Payment was consistent with industry practices was the testimony of his expert witness Curtis W. Tarr.

52. Tarr testified that he had no expertise or knowledge about bonus practices in the computer-leasing industry.

53. Tarr further testified that he had only limited general experience with bonus plans as a member of the Boards of Directors of two public companies, Intermet Corporation and Banta Corporation.

### DISCUSSION

### I. *THE ORDINARY COURSE OF BUSINESS DEFENSE UNDER CODE § 547(c)*

Code § 547(c)(2) provides that a trustee may not avoid an otherwise preferential transfer to the extent that such transfer was—

"(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; and

"(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

"(C) made according to ordinary business terms."

It is provided in Code § 547(g) that the burden is on the transferee to establish each element of any defense asserted under Code § 547(c). See *In re Deltacorp, Inc.*, 179 B.R. 773 (Bankr.S.D.N.Y.1995); *Advo–System v. Maxway Corp.*, 37 F.3d 1044, 1047 (4th Cir. 1994); *Clark v. Balcor Real Estate Finance, Inc. (In re Meridith Partners)*, 12 F.3d 1549, 1553 (10th Cir.1993). The transferee must also establish each of the elements of any defense by a preponderance of the evidence. *In re Seawinds, Ltd.*, 91 B.R. 88, 91 (N.D.Cal.1988), *aff'd*, 888 F.2d 640 (9th Cir. 1989).

Because of the important policies served by preference law, courts have repeatedly held that the exceptions contained in Code § 547(c), including the ordinary course of business exception, "should be narrowly construed." *In re Writing Sales Limited Partnership*, 96 B.R. 175, 178 (Bankr.E.D.Wis. 1989); *In re First Software Corp.*, 81 B.R. 211, 213 (Bankr.D.Mass.1988) (citing cases).

It is appropriate to commence with a discussion of the meaning given to the ordinary course of business defense under Code § 547(c)(2) at the time the trial was held and as clarified by the Second Circuit's February 26, 1996 decision in *In re Roblin Industries, Inc.*, 78 F.3d 30 (2d Cir.1996). Unfortunately the term "ordinary course of business" has been left undefined by the Code. The legislative history merely provides that "[t]he purpose of this exception [547(c)(2) ] is to leave undisturbed normal financing relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or [its] creditors during the debtor's slide into bankruptcy." S.Rep. No. 989, 95th Cong., 2d Sess. 88 (1978), U.S.Code Cong. & Admin.News, 1978, pp. 5787, 5874. Accordingly, the definition of these terms has necessarily to be made on a case by case basis. *In re Magic Circle Energy Corp.*, 64 B.R. 269, 273 (Bankr.W.D.Okla.1986).

In determining whether a transferee has satisfied the requirements of Code § 547(c)(2), it has been held that the court should examine several factors, including the prior course of dealing between the parties, the amount of the payment, the timing of the payment and the circumstances surrounding the payment. *See In re Lan Yik Foods Corp.,* 185 B.R. 103, 111 (Bankr.E.D.N.Y. 1995); *In re White,* 58 B.R. 266, 269 (Bankr. E.D.Tenn.1986); *See also In re Yurika Foods Corp.,* 888 F.2d 42, 45 (6th Cir.1989).

In order to prove the defense, the majority of courts hold that a transferee must show that the transfer was both subjectively and objectively ordinary. *See In re Excello Press, Inc.,* 967 F.2d 1109, 1114 n. 3 (7th Cir.1992) (subjective/objective test is the majority view today); *In re Deltacorp.,* 179 B.R. at 781; *Child World Inc. v. Service Merchandise Co. (In re Child World, Inc.),* 173 B.R. 473, 478 n. 4 (Bankr.S.D.N.Y.1994). To be subjectively 'ordinary' as between the parties implies some consistency with other business transactions between the debtor and the transferee. *Lan Yik,* 185 B.R. at 111; *Magic Circle,* 64 B.R. at 272. To be objectively "ordinary" implies that the subject transfer did not deviate from industry norm. *Magic Circle,* 64 B.R. at 272.

In its recent *Roblin* decision, the Second Circuit Court of Appeals adopted the reasoning of the majority of Circuit Courts in concluding that in order to prove the ordinary course of business exception, a transferee must show that the transfer was both subjectively and objectively ordinary. Prior to *Roblin,* the Second Circuit was the only circuit in which the Court of Appeals had not addressed the meaning of "ordinary business terms" as provided in Code § 547(c)(2)(C). With the single exception of the Eleventh Circuit, the phrase had been held to mean the customary terms and conditions used by other parties in the same industry facing the same or similar problems. *Roblin,* 78 F.3d at 39–40, *citing cases.*

In rejecting the Eleventh Circuit's interpretation of Code § 547(c)(2)(C) which looks to the conduct of the parties themselves to determine if the terms of a preferential transfer are ordinary, the Second Circuit reasoned that by treating both Code § 547(c)(2)(B) and (C) as subjective requirements and focusing entirely upon the conduct of the parties in question, the ordinary business terms requirement of Code § 547(c)(2)(C) becomes surplusage, a redundancy which Congress could not have intended. *Id.* Moreover, a purely subjective approach which focuses solely on the prior dealings of the debtor and creditor does not adequately assure against inequitable treatment of those creditors not fortunate or prescient enough to establish a pattern of "ordinary" debt payments sufficiently in advance of an eventual bankruptcy. *Id.* Finally, the Second Circuit stated that defining the relevant industry in the evaluation is appropriately left to the Bankruptcy Court to determine as questions of fact heavily dependent upon the circumstances of each individual case. *Id.,* at 40.

In the instant matter, the Trustee argues that the Payment does not fall under the protection of Code § 547(c)(2) because (1) given Defendant's personal control over the timing of the payment of his bonus, his status as Chief Executive Officer and his detailed knowledge of the dire financial circumstances of the Debtor, the Payment was not made in the ordinary course of business; (2) the Payment was not consistent with CIS' past practices regarding bonus payments to the Defendant and other senior CIS executives; and (3) the Defendant has not demonstrated that the Payment was consistent with standard industry practices among computer-leasing businesses and executives similarly situated to CIS and the Defendant.

## GOETZMANN'S PERSONAL CONTROL OVER THE CIRCUMSTANCES AND TIMING OF THE PAYMENT RENDER THE PAYMENT OUTSIDE OF THE ORDINARY COURSE OF BUSINESS

In determining whether the Payment was in the ordinary course of business it is important to remember that the Defendant has stipulated that CIS was insolvent at the time of the Payment. The Defendant argues, however, that the manner and timing of the Payment are consistent with CIS' past

bonus practices and industry norms. Assuming, *arguendo,* that this is the case, the Court still finds that the extraordinary circumstances under which the Payment was made renders it outside of the ordinary course of business.

Goetzmann was the founder and Chief Executive Officer Of CIS. As Chief Executive Officer he was imbued with almost total executive control over the company and its finances. In fact, Goetzmann was the *only* person in the company with the power to direct and cause the Payment to be made and it was he who solely determined the terms, conditions, timing and tax withholding of the Payment.

As Chief Executive Officer, Goetzmann must be charged with intimate knowledge of the day-to-day affairs of CIS. From August 1988, when Goetzmann first consulted bankruptcy counsel to December 30, 1988 when the Payment was made, Goetzmann was dealing with a severe financial crisis which escalated on a daily basis, as evidenced by the increasing frequency of Board of Directors meetings and consultations with financial and legal advisors.

By early December 1988, all of CIS' financial advisors had told Goetzmann that CIS' position was hopeless and bankruptcy was imminent. In September 1988 Goetzmann was told by CIS' outside general counsel that if CIS could not consummate a pending deal with Pru–Cap, its principal lender, the prospect of an insolvency work out would have to be addressed. In mid-November, CIS' Chief Financial Officer circulated future cash flow projections from November 1988 through February 1989 showing a possible negative cash flow of $28 million and financing needs of an additional $70 million. In late November 1988 Drexel reported that CIS could not raise additional capital and that CIS should consider soliciting buyers for its business segments. In December 1988, Goetzmann had turned over the conference room adjacent to his office to the outside professionals from the Levin Firm, CS First Boston and Touche Ross who were working on CIS' restructuring and the preparation of CIS' bankruptcy petitions.

On December 12, 1988, eight days prior to Goetzmann's written direction that the Payment be made, Homer Reese, President of Pru–Cap told Goetzmann of Pru–Cap's belief that CIS had no reasonable prospects of raising additional capital or achieving a successful reorganization and sought Goetzmann's permission to allow CIS' chief competitor to manage the process of liquidating CIS' assets. Finally, at the December 21, 1988 special meeting of the Board of Directors, Goetzmann reviewed CIS' severe financial crisis and advised the Board about the advantages and disadvantages of various alternatives if the banks rejected loan extensions proposed by CIS, including a consolidated Chapter 11 filing by CIS and its parent company CMI. Further, CIS' outside general counsel and its bankruptcy counsel both extensively discussed the consequences of a bankruptcy filing by CIS.

In the face of all evidence to the contrary, Goetzmann testified at Trial that at the time he received the Payment he did not believe that CIS would have to file for Chapter 11 protection[2]. Based on the record set forth above, the Court finds that Goetzmann's testimony is not credible.

Goetzmann must be charged with the highest duty since he was the top ranking executive of CIS, with the highest level of responsibility and compensation from the company. The Court finds that it is not ordinary when the top executive of a company orders a $364,781 payment to be made to himself when he knows that the company is insolvent and will be filing for bankruptcy within days. Thus, given that Goetzmann was the top executive of CIS with the sole power to cause and control the direction, timing and nature of the Payment at a time when he knew that CIS was insolvent and would be filing for bankruptcy within days render the Payment extraordinary and outside the ordinary course of business under Code § 547(c)(2)(B).

---

2. Goetzmann was fully aware that the decision to place CIS in bankruptcy was not his alone. He had been told in mid-December by Myron Trepper, his lead bankruptcy counsel at the Levin Firm that it was possible that CIS' creditors would seek to place CIS into involuntary bankruptcy.

*BECAUSE THE PAYMENT IS NOT CONSISTENT WITH PAST BONUS PRACTICES, IT IS OUTSIDE THE ORDINARY COURSE OF BUSINESS*

Even if this Court were to ignore the extraordinary circumstances under which the Payment was made, Goetzmann has failed to prove that the Payment was consistent with CIS' past practices regarding comparable bonus payments to Goetzmann and other CIS executives.

In fiscal 1986 through 1988, only three CIS executives received annual bonuses tied to CIS' net profits: Messrs. Goetzmann, Bartolo and Prinzing. Of the nine annual bonuses that were paid in these years, eight were fully paid on or before mid-May of the corresponding calendar year. The Payment is the sole bonus payment in these fiscal years to fall outside the pattern. On this basis alone, Goetzmann cannot satisfy the requirements of Code § 547(c)(2)(B). The Court, however, will address the evidence presented at Trial which reviewed fifteen years of bonus payments between Goetzmann and CIS.

The evidence presented by the Trustee of Goetzmann's annual bonus payments for the 15 years from fiscal 1974 through 1988 proves that Goetzmann cannot satisfy Code § 547(c)(2)(B). In only one of these years, fiscal 1985, did Goetzmann receive a final bonus payment in December attributable to the immediately preceding fiscal year, and the circumstances of this bonus do not resemble those surrounding the Payment. In June 1985, Goetzmann and Bartolo jointly requested that their respective annual bonuses be paid in seven equal monthly installments beginning on June 30, 1985 and ending on December 31, 1985. Goetzmann was then paid his 1985 bonus according to this prearranged schedule. With regard to the Payment, by contrast, Goetzmann apparently made no decision about payment of the balance of his fiscal 1988 bonus until December 20, 1988, a time when he knew or should have known that CIS had no reasonable prospects of avoiding bankruptcy.

The only other bonus payments made to Goetzmann in December, the payments of the fiscal 1983 and 1984 bonuses in December 1984 and 1985, similarly do not resemble the Payment. CIS' fiscal year 1983 ended on May 31, 1983, but Goetzmann received payment of his fiscal 1983 bonus on December 31, 1984, more than 18 months later. Likewise, CIS' fiscal year 1984 ended on May 31, 1984, but Goetzmann did not receive the final payment of his bonus until December 31, 1985, again 18 months later. Goetzmann's willingness in these years to accept long delays in payment of fiscal bonuses past the end of the corresponding calendar year contradicts his sworn statement in his Affidavit of June 18, 1991 that he and all CIS employees were required to take payment of their bonuses "prior to the end of the calendar year in which the bonus was accrued."

Moreover, Goetzmann's willingness to accept these lengthy delays in earlier years implicates Goetzmann's intent regarding the Payment. In more hopeful times, Goetzmann apparently was content to accept later payment of annual bonuses in order to accommodate CIS cash flow needs. That Goetzmann did not show a similar inclination in December 1988 when CIS was experiencing its worst financial situation in its history is evidence of his expectation when he requested the Payment that CIS would soon file for bankruptcy.

Finally, instead of receiving payment of his 1988 bonus net of withholding taxes in May 1988 when the bonus was calculated, Goetzmann requested and received advances against his bonus. The request of an advance against a bonus that had already been declared and was fully vested is unprecedented in the fifteen years of bonus payments between CIS and Goetzmann presented to this Court at Trial. The Court finds that the Payment is not consistent with prior bonus practices between Goetzmann and CIS and that Goetzmann has failed to meet his burden on this issue.

## II. PAYMENT NOT CONSISTENT WITH STANDARD INDUSTRY PRACTICES AND NOT MADE ACCORDING TO ORDINARY BUSINESS TERMS

The Court next considers whether the Defendant has established that the Payment

was consistent with standard industry practices and made according to ordinary business terms as required by Code § 547(c)(2)(C). The interpretation of this provision has generated a number of decisions concerning the appropriate benchmark to use in determining whether a preference payment's terms are "ordinary." Code § 547(c)(2)(C) requires proof that the subject payments were ordinary in relation to the prevailing standards in the industry. *Roblin*, 78 F.3d at 40, *supra* and *Lan Yik*, 185 B.R. at 114[3].

■ The only evidence presented by Goetzmann to address this point was the testimony of his expert witness, Curtis W. Tarr. Tarr, however, admitted repeatedly that he had no knowledge of the computer leasing industry[4]. Tarr also did not have sufficient expertise to support his opinions about bonus payments generally. Tarr had only limited experience with bonus plans as a member of the Boards of Directors of two public companies. Furthermore, in at least two important aspects, Tarr's testimony actually supports the Trustee's claim. Tarr testified that it was customary (or at least the better practice) for bonus plans to contain a provision controlling the timing of the bonus and that he "would not personally endorse a plan" that did not have such a provision. Goetzmann's bonus plan with CIS contained no such provision. Tarr also testified that if a bonus plan did not contain an express timing provision, past practice between the execu-

tive and the company would control. As the Court has determined above, the Payment was not consistent with CIS' past practices regarding Goetzmann's annual bonus payments.

Goetzmann has failed to offer any probative evidence that the Payment was consistent with bonus payment practices in the computer leasing industry. Accordingly, he has failed to establish an essential element of his defense, the requirement of Code § 547(c)(2)(C).

## III. *THE PAYMENT IS A VOIDABLE PREFERENCE UNDER SECTION 547(b)*

■ A brief discussion of Code § 547(b) is appropriate since the court has rejected Goetzmann's defense under Code § 547(c)(2).

Code § 547(b) provides:

"Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made (a) on or within 90 days before the date of the filing of the petition; or (b) between ninety days and one year before the date of the filing of the petition if such

---

3. *See also Advo–System Inc. v. Maxway Corp.*, 37 F.3d 1044, 1048 (4th Cir.1994); *Sulmeyer v. Suzuki (In re Grand Chevrolet, Inc.)*, 25 F.3d 728, 733 (9th Cir.1994); *Fiber Lite Corp. v. Molded Acoustical Prod., Inc. (In re Molded Acoustical Prod., Inc.)*; 18 F.3d 217, 223 (3d Cir.1994); *Clark v. Balcor Real Estate Finance, Inc. (In re Meridith Hoffman Partners )*, 12 F.3d 1549, 1553 (10th Cir.1993), *cert. denied* — U.S. ——, 114 S.Ct. 2677, 129 L.Ed.2d 812 (1994); *Jones v. United Sav. & Loan Ass'n (In re U.S.A. Inns of Eureka Springs, Ark.)*, 9 F.3d 680, 683–84 (8th Cir.1993); *In re Tolona Pizza Products Corp.*, 3 F.3d 1029, 1032–33 (7th Cir.1993); *Logan v. Basic Distrib. Corp. (In re Fred Hawes Org.)*, 957 F.2d 239, 243–44 (6th Cir.1992); *Compare Marathon Oil Co. v. Flatau (In re Craig Oil Co.)*, 785 F.2d 1563, 1566–67 (11th Cir.1986) (applying the same subjective analysis for both subsections (B) and (C) and, therefore, not requiring proof of ordinary business terms.)

4. Only practices within the parties' industry are relevant under Code § 547(c)(2)(C). In this case the computer leasing industry is the relevant industry. *See In re Century Brass Products, Inc.*, 121 B.R. 136, 139 (Bankr.D.Conn.1990) (" '[O]rdinary business terms' ... refers to 'an objective standard to be shown by the custom in the industry in which the transferee and debtor are engaged.' "). *See also Roblin*, 78 F.3d at 40. If any uncertainty on this issue exists, Goetzmann failed to meet his burden of proving the relevancy of industry practices outside the computer leasing industry. *See In re Production Steel*, 54 B.R. 417, 424 & n. 7 (Bankr.M.D.Tenn.1985) (creditor responsible for demonstrating relevant industry for purposes of ordinary course of business terms analysis).

creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if (a) the case were a case under Chapter 7 of this title; (b) the transfer had not been made; and (c) such creditor received payment of such debt to the extent provided by the provisions of this title."

The parties have stipulated that each of the required elements of Code § 547(b) have been satisfied with respect to the Payment except the last: that the Payment enabled the Defendant to receive more than he would have received if the estate were liquidated under Chapter 7 and the Payment had not been made.

■ The test for this fifth element was established by the Supreme Court in the seminal case of *Palmer Clay Products Co. v. Brown,* 297 U.S. 227, 229, 56 S.Ct. 450, 450–451, 80 L.Ed. 655 (1936).[5] In interpreting the preference provision of the former Bankruptcy Act, the Supreme Court observed that the preferential effect of the payment must be determined "not by what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the actual effect of the payment as determined when bankruptcy results." *Id.* Thus, the Code § 547(b)(5) analysis is to be made as of the time the Debtor filed its bankruptcy petition. *Lan Yik,* 185 B.R. at 108 (Bankr.E.D.N.Y. 1995); *See also In re Pan Am Corp.,* 138 B.R. 382, 388 (Bankr.S.D.N.Y.1992) (requirement of Code § 547(b)(5) met where "it appear[ed] obvious that no creditor with an allowed unsecured claim will receive payment for 100 percent of his claims"); *In re Blue Point Carpet, Inc.,* 102 B.R. 311, 318 (Bankr. E.D.N.Y.1989) (to satisfy Code § 547(b)(5) "the Trustee was required to do no more than show that other creditors are receiving less than 100% of their claims"); *In re National Safe Northeast, Inc.,* 76 B.R. 896, 907 (Bankr.D.Conn.1987) ("As to Code § 547(b)(5), the law is well settled that it is satisfied merely by showing that the estate was insolvent when the petition was filed").

*See also, e.g., In re Lewis W. Shurtleff, Inc.,* 778 F.2d 1416, 1421 (9th Cir.1985) ("[A]s long as the distribution in bankruptcy is less than one-hundred percent, *any* payment 'on account' to an unsecured creditor during the preference period will enable that creditor to receive more than he would have received in liquidation had the payment not been made.") (emphasis in original).

The Defendant has already admitted in his Answer that CIS was insolvent at the time he received the Payment. To further support the position that a preferential transfer had occurred, the Trustee testified at Trial that after undertaking several valuation studies of CIS as of the Filing Date through 1992, the unsecured creditors would not receive 100 cents on the dollar in a liquidation under Chapter 7, but would at most receive fifty cents on the dollar, assuming a $150 million claim which the IRS has asserted against the estate is compromised. He further stated that if this IRS claim is not compromised the unsecured creditors would receive nothing in a Chapter 7 liquidation. The studies undertaken by the Trustee as of the Filing Date included reviewing accounts receivable billing, isolating assets to which CIS had clear title, as well as reviewing major remarketing agreements. He also reviewed possible settlements of pending litigation against CIS as well CIS' liabilities, including the aforementioned IRS claim asserted against the estate in excess of $150 million. The Trustee went on to testify that on the Filing Date CIS had a lower value than at the time of Trial because liquidating the estate on the Filing Date would have rendered the estate insolvent and that CIS would have been spending more on professionals than it had assets to pay them with. The Trustee therefore concluded that CIS' unsecured creditors would not have received 100 percent of their claims in a Chapter 7 liquidation either at the Filing Date or at the time of Trial.

Based upon the evidence introduced at Trial, including the testimony of the Trustee, the Court finds that unsecured creditors would have received less than 100 percent of

5. Code § 547(b)(5) codifies the Supreme Court's holding in *Palmer Clay.*

their claims at the time the Debtor filed its petition on January 13, 1989. The conclusion is inescapable that the Payment enabled Goetzmann, a non-priority unsecured creditor, to receive more than he would have received in a Chapter 7 distribution.

Accordingly, this Court finds that the Trustee has met his burden of proof with respect to the fifth element of Code § 547(b), that all of the requirements of Code § 547(b) have been satisfied and that the Payment was a preferential transfer as defined by Section 547(b).

## IV. THE FULL AMOUNT OF THE PAYMENT, INCLUDING MONIES PAID TO TAXING AUTHORITIES, IS RECOVERABLE BY THE TRUSTEE

■ Goetzmann has argued that even if the Payment is a voidable preference, the Trustee should not be permitted to recover the $241,000 that CIS withheld and paid at Goetzmann's direction to federal and state taxing authorities. At the hearing on the Trustee's motion for partial summary judgment on July 26, 1991, this Court rejected that argument. Goetzmann has not presented any evidence of compelling circumstances which would cause the Court to revisit its earlier ruling on this issue. Evidence of compelling circumstances includes "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Wilder v. Bernstein,* 645 F.Supp. 1292, 1310 (S.D.N.Y.1986), *aff'd,* 848 F.2d 1338 (2d Cir.1988), *quoting,* 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure,* Section 4478, at 788 (1981). The Court therefore adheres to its prior ruling and finds that the entirety of the Payment is recoverable by the Trustee from Goetzmann.

### CONCLUSION

The Trustee has proven all of the elements required to avoid the $364,781 Payment under Code § 547(b). Goetzmann has failed to sustain his asserted defense under Code § 547(c) because he has failed to prove that the Payment was made in the ordinary

course of business or financial affairs as between CIS and himself as required under Code § 547(c)(2)(B). Goetzmann has also failed to prove that the Payment was made according to standard industry practices and ordinary business terms as required by Code § 547(c)(2)(C). The Court holds that the Trustee may recover the entire $364,781 Payment plus interest dating from March 22, 1990, from Goetzmann.

Settle judgment.