**In re NORTH AMERICAN ENERGY CONSERVATION, INC., Debtor.**

**Lee E. Buchwald, as Trustee of the estate of North American Energy Conservation, Inc., Plaintiff,**

**v.**

**Avista Energy, Inc., Defendant.**

**Bankruptcy No. 00–40563 (PCB).**

**Adversary No. 01–03633 (PCB).**

United States Bankruptcy Court, S.D. New York.

Feb. 17, 2006.

Morrison & Foerster LLP., Feldman & Troup, P.C., New York, New York, By: Larren M. Nashelsky, for Defendant Avista Energy, Inc.

Stevens & Lee, New York, NY, By: Nicholas F. Kajon, Special Litigation Counsel to Chapter 7 Trustee, Lee E. Buchwald.

### MEMORANDUM DECISION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PRUDENCE CARTER BEATTY, Bankruptcy Judge.

The Chapter 7 Trustee of North American Energy Conservation, Inc., in an effort to create an estate for unsecured creditors, filed this preference action at the expense of one of the Debtor's long-time electricity trading partners, Avista Energy, Inc.[1] The Trustee seeks to recover $1,698,400 it paid to Avista for energy the Debtor requested after it closed its electrical energy trading division. Avista has moved the court for summary judgment seeking a determination that these monies were paid by North American within the ordinary course of its business. There are no material facts in

---

1. This is not the only preference action North American has filed against one of its energy suppliers. *See Debtor v. Public Service Electric & Gas Company,* AP No. 01–3634 and *Debtor v. Cinergy Services, Inc.,* AP No. 01–3636.

dispute. The Chapter 7 Trustee, however, opposes Avista's motion on the grounds that the ordinary course of business defense is inapplicable as a matter of law since the Debtor was closing its operations at the time the transfers were made.

For the reasons which follow, the Court grants summary judgment in Avista's favor. The Court holds that the transfers were timely payments of debt incurred by the Debtor in the ordinary course of its business and that the mere fact that North American was winding-down its electrical energy division both at the time it requested electricity and at the time the transfers were made does not obviate Avista's use of the ordinary course of business defense.

### Findings of Fact

#### The Parties

1. On March 2, 2000, (the "Petition Date") North American Energy Conservation Inc. (the "Debtor") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Code"). On April 17, 2002, this case was converted to a chapter 7 proceeding.

2. Prior to the Petition Date, the Debtor had two distinct lines of business: (1) the marketing of electric energy and (2) the marketing of natural gas, which had both a wholesale and retail division. By August 1998, however, Debtor's electric energy trading business was closing and the Debtor had fired all of its employees. The Debtor's President also resigned and was appointed acting President of the Debtor, in charge of winding-down the electric energy trading division as well as taking charge of the natural gas division.[2]

During this period, the Debtor not only continued to satisfy its obligations under pre-existing contracts, including the contract at issue, it continued to request and purchase electricity from its suppliers under those same pre-existing contracts.

3. Avista Energy, Inc. ("Avista"), the defendant, was a supplier to the Debtor's electric energy trading division.

4. On December 10, 2001, the Debtor commenced this adversary proceeding pursuant to Code §§ 547(b) and 550(a)(1) seeking to avoid and recover payments aggregating $1,698,400 made by wire transfer to Avista during the ninety-day period prior to the Petition Date (collectively, the "Transfers"). The complaint does not state why the Debtor chose to request and purchase services from Avista after it began closing its operations. However, under its Electrical Agreement with Avista (as defined below), the Debtor could initiate a request for electricity at any time.

5. On March 28, 2002, Avista filed a motion to dismiss for failure to state a claim upon which relief may be granted. That motion was converted by the court, with the parties consent, to a motion for summary judgment when evidence outside the pleadings was presented to, and not excluded by, the court.[3]

#### The Electricity Agreement

6. On or about May 1, 1998, the Debtor and Avista entered into a Power Purchase and Sale Agreement (the "Electrical Agreement"). The Electrical Agreement was an electricity supply contract under which the Debtor made on-going determinations as to its need to supply its custom-

---

2. As of February 29, 2000, just days before the Petition Date, the Debtor discontinued marketing wholesale gas. The retail gas marketing business continued operating post-petition until it was sold as a going concern to Amerada Hess Corporation in April 2000.

3. *See* Bankruptcy Rules 7012(b) and 7056 which make FRCP 12(b)(6) and 56 applicable to adversary proceedings.

ers with "electric energy, energy capacity and dynamically scheduled services" (generally referred to as "Electricity") and agreed to enter into separate transactions for the purchase and sale of Electricity as its needs arose. Avista, the supplier, simply fulfilled the Debtor's requests for Electricity. This was not a requirements contract which would mandate any purchase amount or a fixed price. Rather, the specific terms of each particular transaction for the purchase and sale of Electricity, including its price, was merely required to be set forth in a written confirmation of the transaction. These terms varied according to each individual transaction requested by and entered into by the Debtor.

7. No more than ten days after the end of each calendar month, Avista was required to prepare a statement detailing the transactions between the parties during the proceeding month and listing the amounts due from the Debtor to Avista. The Debtor was then required to tender payment to Avista, by wire transfer, of the amount due for all Electricity purchased by the Debtor during the preceding month. If the Debtor failed to pay the invoice when due, the Debtor was required to pay Avista interest on the unpaid balance that accrued on the principal for each calendar day from the agreed-upon due date at a fixed interest rate.

### The Transfers

8. During November 1999, over one year after the Debtor began winding down its electric energy trading business it requested and received Electricity from Avista. On or about December 7, 1999, Avista issued an invoice to the Debtor requesting payment for the Electricity which it provided to the Debtor during that month ("the November Invoice"). The due date on the November Invoice was December 20, 1999. On December 20, 1999, the Debtor made a wire transfer of $810,600 to Avista in full satisfaction of the November Invoice.

9. In December 1999, Avista honored a similar request for Electricity from the Debtor and on or about January 10, 2000, Avista issued an invoice to the Debtor requesting payment for the Electricity which it provided to the Debtor during the month of December 1999 ("the December Invoice," collectively, with the November Invoice, the "Invoices"). The due date for the December Invoice was January 20, 2000. On January 20, 2000 the Debtor made a wire transfer of $887,800 to Avista in full satisfaction of the December Invoice.

10. The Debtor's payment of the balances owed to Avista during November and December 1999 was consistent with the terms of both the Electrical Agreement and with the Invoices. In fact, the payment history between the parties reflects that the Debtor's monthly payments as far back as May 1999 occurred only through wire transfer and that each monthly payment was consistently paid on time or within one business day of the due date.[4]

4. The Following undisputed chart of the historical payments is found as Exhibit D to Avista's Motion for Summary Judgment:

| Due Date | Payment Amount | Payment Method | Date Paid | Date Late |
|----------|----------------|----------------|-----------|-----------|
| 5/20/99 | $506,000.00 | Wire Transfer | 5/21/99 | 1 |
| 6/21/99 | $460,000.00 | Wire Transfer | 6/21/99 | 0 |
| 6/21/99 | $468,000.00 | Wire Transfer | 6/21/99 | 0 |
| 11/19/99 | $405,720.00 | Wire Transfer | 11/22/99 | 1 |
| 11/19/99 | $404,880.00 | Wire Transfer | 11/22/99 | 1 |

11. The regular practice of sending invoices and settling accounts on a monthly basis and conveying funds through wire transfers is also consistent with common practice in the electrical energy trading industry.

### Discussion

██ The Trustee, in an effort to create an estate for unsecured creditors, has brought this novel preference action seeking to recover the Transfers, *which the Debtor itself initiated* after it closed its electricity business pursuant to Code §§ 547(b) and 550(a)(1). The Trustee does not dispute any material facts in this matter. Rather, he argues that the ordinary course of business exception under Code § 547(c) should not apply as a matter of law because the Debtor had ceased operating its electrical energy trading division when the Transfers were made.

Avista urges that the undisputed facts demonstrate that the Debtor's complaint is without merit and that the Transfers fall squarely within the Code § 547(c)(2) ordinary course of business exception.

More specifically, Avista argues that the Transfers (I) constitute payments of debt incurred by the Debtor in the ordinary course of business between Avista and the Debtor, (ii) were paid in a timely fashion for invoiced amounts pursuant to the Electrical Agreement and otherwise generally made in accordance with the ordinary course of business affairs between Avista and the Debtor and (iii) were made according to ordinary business terms and in accordance with standard practices in the electrical energy trading industry. Moreover, Avista argues, the Debtor's winding-down of its electricity energy trading business is not the sole determinative factor in eliminating the use of the ordinary course defense. Avista has also moved under Code § 546(e) seeking a determination that the Transfers are not voidable because they are settlement payments made to forward contract merchants.

For the reasons which follow, the court grants Avista's motion.

### The Ordinary Course of Business Defense Under Code § 547(c)

██ Generally, Code § 547(c)(2) provides an affirmative defense to an otherwise avoidable preferential transfer where the transaction was made in the ordinary course of business. Specifically, Code § 547(c)(2) states that an otherwise avoidable preferential transfer[5] may not be avoided to the extent that the transfer was

"(A) in the payment of a debt incurred by the Debtor in the ordinary course of business or financial affairs of the Debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the Debtor and the transferee; and

(C) made according to ordinary terms[.]"

The burden is on the transferee, by a preponderance of the evidence, to establish each element of any defense asserted under Code § 547(c). *In re Roblin Industries, Inc.*, 78 F.3d 30, 39 (2d Cir.1996).

██ A creditor asserting a defense under the exception must show that the preferential payments at issue were incurred and paid in the ordinary course of business of both parties, and made according to "ordinary business terms." Al-

---

The November payments occurred after a weekend, making them only one business day past due.

5. Code § 547(b) provides that a debtor may seek to recover certain transfers of property or an interest therein made to creditors during the ninety-day period prior to the Debtor's bankruptcy filing.

though formulations of this defense vary across jurisdictions, courts generally focus on determining whether the transfers were consistent with the parties' previous transactions, conformed to standard industry practices, or were made as a result of unusual actions of either party or other extraordinary circumstances. *See Roblin* at 39. Additionally, courts have repeatedly held that the ordinary course of business exception should be narrowly construed. *See In re CIS Corp.*, 195 B.R. 251 (Bankr.S.D.N.Y.1996). In determining its application, courts examine several factors, which include the prior course of dealings between the parties, the amount of the payment, the timing of the payment and the circumstances surrounding the payment *vis a vis* prior payments. *Id.*

█ In order to prevail, the transferee must therefore establish that the transfer was both subjectively and objectively ordinary. Consistency with other business transactions between the debtor and the transferee indicates that it is subjectively ordinary. To be deemed objectively ordinary, the subject transfer must be shown to be consistent with the industry norm. *Roblin*, 78 F.3d at 39.

A. *The Transfers Were in Payment of Debts Incurred in the Ordinary Course of Business Between the Parties*

It is undisputed that on or about May 1, 1998, the Debtor and Avista entered into the Electrical Agreement which provided that the Debtor could request and purchase electricity from Avista with no contract minimums. Thus, upon it own initiative, the Debtor could request Electricity without being subject to any obligations under a requirements contract. Each month Avista prepared a billing statement detailing the transactions between the parties during the preceding month, with a list of all amounts due. It is also undisputed that each month Avista did in fact submit its invoices to the Debtor and that the Debtor consistently paid the invoices, by wire transfer, on the due date specified in each invoice.

The Debtor does not dispute that the Transfers at issue were made pursuant to the precise terms of the Electrical Agreement. Rather, the Debtor argues that while the transactions contemplated by the Electrical Agreement would have, at one time, fallen under the definition of the Debtor's ordinary course of business, the same types of transactions taking place after August 1998 when the Debtor discontinued its electrical energy trading business, could not constitute the ordinary course of the Debtors business, because the Debtor was no longer engaging in that business.

The court finds that the Debtor has set forth a very limited definition of ordinary course of business. True, the Debtor was in the process of winding down its electrical energy trading division. However, the Debtor was not acting as if it were winding down, at least not in its relationship with Avista. As late as November and December 1999, over one year after the winding down of its electrical energy trading division, the Debtor was still requesting, purchasing and receiving Electricity from Avista presumably because it could make a favorable sale or fulfill a contract obligation of its own. In fact, the employee assigned to deal with outstanding obligations of the electrical business appears to have satisfied all of the duties required to fulfill all business transactions between the parties. Moreover, the Debtor never informed Avista of any changes in its business practice or business. In short, while the Transfers may have represented the final obligations in a business that was no longer accepting future obligations, they

were made in the same manner, under the same contract, and on the same terms, as when the business was not winding down. Thus, there is no showing that the Transfers were anything other than ordinary business transactions between the Debtor and Avista.

The Trustee relies on *In re Craig Oil Co.*, 785 F.2d 1563 (11th Cir.1986), which reliance the court finds baffling. Granted, *Craig Oil* case dealt with a debtor's preferential payments to a creditor after the debtor ceased operations. However, in finding that the debtor's payments were not in the ordinary course of business, the Eleventh Circuit Court of Appeals held that the ceasing of the debtor's operations was one of *many* factors which it took into account, including:

> (1) that the debtor made the payments by cashier's check, in contrast to its usual practice of paying by corporate check;
> (2) that the debtor was late making the payments, in comparison to the parties' historical course of dealing, during which it had generally paid on time;
> (3) that the creditor had requested assurance from the debtor that it would continue to make its payments on time after learning from another creditor that the debtor was experiencing cash flow problems; and
> (4) that another of the debtor's creditors was allegedly attempting to push the debtor into bankruptcy.

When taken together, the 11th Circuit found that all of these factors constituted a marked departure from the typical course of business conducted by the parties. *Craig Oil* at 1567 ("While we concur that dissolution of the business may be relevant in determining what constitutes the ordinary course of business, *we do not conclude that factor alone controls this case.*") (emphasis added); *accord In re Rice*, 1999

Bankr.LEXIS 1861 at *38 (Bankr. M.D.Ga.) ("The fact that a business has ceased operations is relevant but not decisive in determining what constitutes the ordinary course of business.").

Rather, this court is in agreement with those jurisdictions which have found that despite the cessation of the debtor's business, the ordinary course of business exception is available to the transferee. *See In re Broadview Lumber Co., Inc.*, 168 B.R. 941 (Bankr.W.D.Mo.1994); *aff'd* 118 F.3d 1246 (8th Cir.1997) (wages paid to an employee for five months of work after the debtor's business ceased operating and where the employee's duties pertained to the debtor's liquidation and closing of the business, were "in the ordinary course"); *In re Fulghum Construction Corp.*, 872 F.2d 739 (6th Cir.1989) (advances made in good faith by a debtor's shareholder to cover the debtor's payroll during the completion of jobs in progress after the debtor ceased doing business, were in the ordinary course).

In the instant case, the Debtor's request for Electricity and its payment of the balances owed to Avista during November and December 1999 were consistent with the terms of the Electricity Agreement and the Invoices. Such timely payments were also consistent with the business practices observed by the Debtor in the six month period preceding December 1999. During that preceding period, all payments had been made either exactly on time or only one day late. Thus, the Transfers were not uncharacteristically late nor uncharacteristically timely. Rather, they were in line with the previous relationship between the parties. The Transfers were for amounts similar to the amounts of previous invoices. The conveyance of funds via wire transfer was also the method used between the parties for the earlier payments.

Looking at the totally of circumstances, this court finds that the winding down of the Debtor's electrical energy trading business does not in and of itself, as a matter of law, obviate the use of the ordinary course of business exception. The court finds that the Transfers at issue were (I) in payment of debts incurred by the Debtor in the ordinary course of business between the Debtor and Avista and (ii) were made in a fashion consistent with the ordinary business practices observed between the Debtor and Avista during the period of time preceding December 1999.

B. *The Transfers Were Made According to Ordinary Business Terms*

The Debtor and Avista are both entities whose businesses consist or consisted in part of entering into contracts regarding the purchase and sale of Electricity. Both parties have similar contracts with other entities, as evidenced by the other adversary proceedings and the associated pleadings in this case regarding similar business arrangements.

The Debtor has put forth no evidence to dispute Avista's contention that in the electrical energy trading industry, invoices evidencing financial terms are typically generated and sent to the other party as the Electrical Agreement set forth; that the monthly settlement payment is a typical structure of these types of contracts; and that the Transfers constituted payments that were timely paid in the amounts due according to the Invoices. Both the Debtor and Avista have other relationships with other entities which parallel the financial relationship between the Debtor and Avista.

The court therefore finds that the Transfers were made according to ordinary industry standards.

*Conclusion*

Based on the findings of fact and conclusions of law stated above, the Court finding no material facts in dispute, holds that the Transfers between the Debtor and Avista constitute payments of debts incurred by the Debtor in the ordinary course of its business; the Transfers were made in accordance with the ordinary course of business affairs between the Debtor and Avista; and the Transfers were made in accordance with standard practices in the electrical energy trading business. Avista's motion for summary judgment under Code § 547(c)(2) is granted.

Since the Transfers fall within the ordinary course of business exception under Code § 547(c)(2) it is unnecessary for the court to determine whether Avista is a "forward contract merchant" pursuant to Code § 546(e).

Settle Order.