In the Matter of WRITING SALES LIMITED PARTNERSHIP, Debtor,

WRITING SALES LIMITED PARTNERSHIP, Debtor in Possession, Plaintiff,

v.

PILOT CORPORATION OF AMERICA, a foreign corporation, Defendant.

Bankruptcy No. 85–02591.

Adv. No. 86–0192.

United States Bankruptcy Court, E.D. Wisconsin.

Jan. 25, 1989.

See also, Bkrtcy., 96 B.R. 179.

Robert L. Mann, Kohner, Mann & Kailas, S.C., Milwaukee, Wis., for plaintiff.

Andrew N. Herbach, Howard, Peterman, Solochek & Nashban, Milwaukee, Wis., for defendant.

## MEMORANDUM DECISION

C.N. CLEVERT, Chief Judge.

Writing Sales Limited Partnership commenced this adversary proceeding to recover six alleged preferential payments it made to Pilot Corporation of America within 90 days of filing its voluntary Chapter 11 petition. Pilot defends the transfers by arguing that Writing Sales was solvent at the time the transfers were made and challenges the method Writing Sales uses to value its inventory. Pilot affirmatively alleges that the transfers were made in the ordinary course of business and according to ordinary business terms.

## FACTS

Writing Sales purchased goods from Pilot for resale in its office products business beginning in 1973.[1] Writing Sales tried to obtain an 18 to 24 percent gross profit margin on merchandise it purchased from Pilot and nearly 200 other suppliers, depending on manufacturer's costs.

Pilot's sales invoices read 2% 10th, net EOM. This was understood to mean that Writing Sales was entitled to a two percent discount if the debt was paid by the tenth of the next month and that full payment was due by the end of the month. On average, Writing Sales paid Pilot's invoices as follows:

| Year | Days | |
|------|------|---|
| 1983 | 83 | |
| 1984 | 78 | |
| 1985 | 99 | (outside the preference period) |
| 1985 | 83 | (in the preference period) |

Although this was not in accordance with invoice terms, Pilot initially permitted the practice without penalty for late payments. According to the testimony, this was described as being indicative of Pilot's policy of allowing some customers to deviate from the written terms of sale by "special arrangement." Moreover, Pilot enters these special arrangements with Writing Sales and a limited number of other customers in an effort to keep their business.

Pilot uses four steps to collect delinquent accounts. A delinquent notice is sent at the beginning of the month followed up by a telegram. If the account is not paid at the end of the month, a telephone call is made to the customer. If payment still is not forthcoming a credit hold is imposed. This consists of refusing to ship orders until a payment agreement is made by Pilot's credit manager and the customer.

From 1983 to early 1985, Pilot placed numerous credit holds on Writing Sales' orders. To get off these credit holds, Writing Sales paid specific invoices or made commitments to pay certain invoices to get shipments released. During the 90 day period prior to this Chapter 11, the practice changed. Writing Sales made payments to

---

**1.** Writing Sales Limited Partnership was formed in June of 1983, as an outgrowth of the Writing Sales Division of Matex, Inc., which began in 1973. Its general partner is Writing Sales General Partner, Inc.

Pilot which were larger than the authorized shipments, used cashier's checks, brought its account balance to zero, and offered to pay in advance to persuade Pilot to terminate its credit hold and to release greatly needed merchandise.

Between April 12 and June 6, 1985, Writing Sales issued six checks to Pilot, totalling $133,609.83, which were honored between May 13 and June 10, 1985.[2]

All shipments subsequent to May 31 were delivered on a cash-in-advance basis and paid by cashier's check because Pilot would not otherwise ship goods to Writing Sales. Nonetheless, except for very small shipments in June, no merchandise was shipped to Writing Sales.

Although Ralph Limbach usually handled accounts payable, William Isbister, president of the general partner, unsuccessfully tried to discuss the credit hold with Pilot's credit manager, Anna Pritchard. Isbister had to intervene in early 1985 because Pritchard rarely returned Limbach's phone calls, especially during the last three months of Writing Sales' operations.

Pilot's Chief Executive Officer became involved in Pilot's collection effort during the Wholesalers Association convention in May 1985, and spoke to Isbister about the size of Writing Sales' delinquent account.

### DISCUSSION

■ Under 11 U.S.C. § 547(b)[3], five elements must be proven to establish a voidable preference. Although Pilot has admitted all of the elements of a preference, it asserts that Writing Sales was solvent at the time the transfers were made. 11 U.S.

C. § 547(b)(3). The Code presumes a debtor to be insolvent during the preference period. 11 U.S.C. § 547(f). This presumption requires Pilot to present evidence to rebut the presumption, but it does not relieve Writing Sales of its burden of proof.

Insolvency is measured by the "balance sheet" method with liabilities exceeding the "fair valuation" of assets. 11 U.S.C. § 101(31). In a partnership case, the issue of insolvency includes consideration of the general partner's assets. Thus, for the purpose of determining a partnership's solvency, each general partner's assets (other than property transferred, concealed or removed with intent to hinder, delay or defraud creditors) must be taken into account along with the debtor's to the extent that the value of nonpartnership property exceeds nonpartnership debts. 11 U.S.C. § 101(31)(B).

Pilot contends that Writing Sales General Partner, Inc., the debtor's general partner, was solvent but has not presented any supporting evidence. On the other hand, Isbister has given unchallenged testimony that the only assets of the general partnership were a possible account receivable from Writing Sales for management services and a small amount of cash due on employment taxes. Isbister further testified that although the general partner's books reflect its investment in Writing Sales, the investment was not worth anything because of Writing Sales's losses. He added that the account receivable was a corresponding liability of the debtor so the net result was zero.

■ Pilot notes that Writing Sales' balance sheet reflects the value of its invento-

**2.**

| Date of Check | Amount of Check | Date Check Paid |
|---|---|---|
| April 12, 1985 | $ 16,231.72 | May 13, 1985 |
| April 19, 1985 | 23,833.26 | May 17, 1985 |
| April 25, 1985 | 24,096.56 | June 12, 1985 |
| June 3, 1985 | 8,344.92 | June 7, 1985 |
| June 5, 1985 | 22,910.44 | June 10, 1985 |
| June 6, 1985 | 38,192.93 | June 10, 1985 |
| | $133,609.83 | |

**3.** The following elements must be proven under 11 U.S.C. § 547(b):

　1) The debtor's interest in property was transferred to or for the benefit of a creditor;

　2) The transfer was made for or on account of an antecedent debt;

　3) The transfer was made while the debtor was insolvent;

　4) The transfer was made within 90 days of filing; and

　5) The transfer enabled the creditors to receive more than it would have received if the transferred property had remained in the bankruptcy estate and was distributed under Chapter 7.

*Id.*

ry at cost and it argues that it should be valued on a going concern basis. However, fair valuation does not mean value in the worst or best circumstances. "Instead, fair valuation is measured by a hypothetical liquidation of [the] debtor's assets over a reasonable period of time ... of 'what can be realized from the assets by converting them into, or reducing them to, cash under carefully guarded, if not ideal conditions.' " *DuVoisin v. Anderson (In re Southern Indus. Banking Corp.)*, 71 B.R. 351, 357 (Bankr.E.D.Tenn.1987) (citations omitted). *See Foley v. Briden (In re Arrowhead Gardens, Inc.)*, 32 B.R. 296, 299 (Bankr.D.Mass.1983).

It appears that fair valuation is what a buyer for the entire business would pay for the goods. In this case, fair valuation would, at best, have to reflect the 18 percent to 24 percent markup that Writing Sales sought, but apparently failed to maintain. Because new inventory could have been ordered at a lower cost which was well below that markup, an inventory liquidation would not have brought the higher price. Hence, it must be concluded that cost value is the fair gauge for valuation in this case. Consequently, the court finds that Writing Sales has met its burden of establishing the value of its assets. *See Samson v. Alton Banking & Trust Co. (In re Ebbler Furniture & Appliances, Inc.)*, 804 F.2d 87 (7th Cir.1986).

■ Once a debtor has established a voidable preference, a creditor has the burden of proving that an exception exists. 11 U.S.C. § 547(g). Pilot asserts that an exception exists under 11 U.S.C. § 547(c)(2).[4] However, § 547(c) should be narrowly construed. *First Software Corp. v. Curtis Manufacturing Co. (In re First Software Corp.)*, 81 B.R. 211 (D.Mass.1988).

■ In this case, Pilot alleges that the payments it received from Writing Sales were made in the ordinary course of business and made according to ordinary busi-

ness terms. The course of conduct between the parties establishes what the ordinary course of business is between them. *See, e.g., Newton v. Ed's Supply Co. (In re White)*, 58 B.R. 266 (Bankr.E.D.Tenn.1986); *Ewald Bros., Inc. v. Kraft, Inc. (In re Ewald Bros., Inc.)*, 45 B.R. 52 (Bankr.D. Minn.1984). Although Writing Sales argues that constantly imposed credit holds cannot represent the ordinary course of business between the parties, that is the way they were used to doing business with each other. Despite that argument, evidence clearly established that during the preference period it became significantly more difficult for Writing Sales to secure release of a credit hold.

Before the preference period, Writing Sales routinely made special payment arrangements with Pilot and Pilot quickly resumed shipping merchandise. In contrast, during the preference period Pilot caused Writing Sales to pay its account balance in full, by cashiers check, before new shipments were authorized.

By June 10, Pilot received payments of $61,000.00 from Writing Sales but still failed to ship merchandise. According to the testimony, Pilot was not going to ship any goods to Writing Sales because Pritchard was still conducting a review of the account. Pritchard testified that it was not out of the ordinary for Pilot to leave a credit hold in place after receiving payments. However, she added that although she was concerned about Writing Sales' account, a review of similar accounts was not uncommon with respect to customers who consistently paid outside invoice terms.

Pritchard acknowledges that she was the person at Pilot responsible for removing a customer from credit hold, however, she denies making herself unavailable when Limbach was attempting to have it lifted.

"Section 547(c)(2) should protect those payments which do not result from 'un-

---

4. Under 11 U.S.C. § 547(c)(2), a preference may be avoided to the extent that such transfer was—

   (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

   (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

   (C) made according to ordinary business terms.

usual' debt collection or payment practices.... Thus, whenever the bankruptcy court receives evidence of unusual collection efforts, it must consider whether the debtor's payment was in fact a response to those efforts." *Marathon Oil Co. v. Flatau (In re Craig Oil Co.)*, 785 F.2d 1563, 1566 (11th Cir.1986).

Pilot has not met its burden of proving that the transfers were made in the ordinary course of business between it and Writing Sales pursuant to 11 U.S.C. § 547(c)(2)(B) nor has it shown that the payments were made according to ordinary business terms pursuant to 11 U.S.C. § 547(c)(2)(C). From the evidence and testimony, it was shown that Pilot put intense pressure on Writing Sales to bring its account current. Furthermore, Writing Sales was forced to make large payments by cashier's check in order to receive merchandise. These actions, and related shipping delays were "unusual" and not in the ordinary course of business dealings between Writing Sales and Pilot.

For the reasons stated, Writing Sales Limited Partnership is entitled to judgment against Pilot Corporation of America in the sum $133,609.83.