In the Matter of CENTURY BRASS PRODUCTS, INC., Debtor.

Jerome E. CAPLAN, Plan Administrator, Plaintiff,

v.

PETERSON ENGINEERING CO., Defendant.

Bankruptcy No. 2–90–00197. Adv. No. 2–90–2078.

United States Bankruptcy Court, D. Connecticut.

Nov. 5, 1990.

Gale K. Busemeyer and Lissa J. Paris, Murtha, Cullina, Richter and Pinney, Hartford, Conn., for plaintiff.

Peter B. Blasini, Cantor, Floman, Russell and Johnson–Fay, P.C., Orange, Conn., for defendant.

## MEMORANDUM OF DECISION

ROBERT L. KRECHEVSKY, Chief Judge.

### I.

### ISSUE

At issue in this core proceeding is the application of the "ordinary course of business" defense to an action seeking to recover an otherwise preferential transfer under the provisions of Bankruptcy Code § 547. The following background relies upon a stipulation of facts filed by the parties and a brief hearing which concluded on October 4, 1990.

### II.

### FACTS

The plaintiff, Jerome E. Caplan, is the plan administrator under a confirmed chapter 11 plan. The debtor, Century Brass Products, Inc. (Century) filed its voluntary chapter 11 petition on March 15, 1985 at a time when it was operating a brass mill. The defendant, Peterson Engineering Co. (Peterson), for many years had been regularly performing work for Century involving the installation and repair of industrial equipment. Peterson did its work either under a contract (secured through a bidding process), which called for monthly billings, or on a materials and time basis after

receiving a phoned request from Century followed by a written work order, with the invoice rendered upon completion of the work. All Peterson invoices sent to Century stated "TERMS: NET CASH." William B. MacFarland, president of Peterson, testified that despite this language on the invoices, the terms to Century were understood to be "net 30 days." He stated that prior to 1982 Century rarely paid invoices within 30 days, that there typically was a delay of 60 days before payment was received by Peterson.

Starting in 1982 Century's payments to Peterson became less frequent and MacFarland found it necessary to telephone Century to ask for payment. Such calls usually resulted in Peterson receiving some payment. Century made payments to Peterson by check, and in most instances one check covered several invoices.

Ronald Chrzanowski, Century's accounts payable manager during the periods being discussed, testified that in the year leading up to the bankruptcy filing on March 15, 1985, as Century's cash position worsened, payments to Century's vendors became more delayed. He stated that vendors to Century who refused to deliver goods or services unless some payment was received on account, or who, like MacFarland, personally called him for payments, would get paid before other vendors. Century's custom was to pay the vendors' oldest invoices first.

Two payments made by Century to Peterson are at issue in this proceeding. Century paid Peterson $9466.66 for invoices dated August 30, August 31 and September 11, 1984 by check received by Peterson on January 9, 1985. Century paid Peterson $15,942.28 in satisfaction of invoices dated September 11 and September 19, 1984 by check received by Peterson on February 7, 1985.

The stipulation filed by the parties shows that during 1982 the average time between invoice date and payment date was 80 days; in 1983 the average time was 72 days; and in 1984 the average time was 85 days. The check received by Peterson on January 9, 1985 was for invoices billed 120, 131 and 132 days before payment. The check received on February 7, 1985 was for invoices billed 141 and 149 days before payment.

## III.

## DISCUSSION

The parties have stipulated that the two payments were made (1) to Peterson as a creditor; (2) on account of antecedent debt; (3) while Century was insolvent; (4) within 90 days before the date of Century's petition; and (5) such payment enabled Peterson to receive more than it would have if the transfers had not been made and Century's case were a case under chapter 7. *See* Code § 547(b). The plaintiff, therefore, may avoid these payments as preferential unless the asserted ordinary course of business defense contained in § 547(c)(2) has been established.

Section 547(c)(2) provides that a transfer may not be avoided

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and transferee; and

(C) made according to ordinary business terms.

The plaintiff concedes that the condition set out in subsection (c)(2)(A) is not in issue, but denies that Peterson has satisfied either subdivision (B) or (C). Peterson has the burden of proving the remaining two conditions. Code § 547(g).

### Subdivision (c)(2)(B)

In determining whether payments were made in the ordinary course of business of the debtor and the transferee as stated in subdivision (c)(2)(B), courts generally look to what was the prior history of similar transactions between the parties. *Richardson v. Philadelphia Housing Auth. (In re Richardson)*, 94 B.R. 56, 59–60 (Bankr.E.D.Pa.1988). On the record made in this proceeding I conclude that the

payments in question were not made in the ordinary course of business. These payments were between 120 and 149 days, or an average of 134 days, after invoice date, when the average delay in prior years never exceeded 85 days. *See, Global Distribution Network, Inc. v. Star Expansion Co. (In re Global Distribution Network, Inc.)*, 103 B.R. 949, 954–55 (Bankr.N.D.Ill. 1989) (In ruling involving three defendants, the court held that payments were not in ordinary course where first defendant's pre-preference period account averaged 76 days between invoice date and payment but preference period payments averaged 118 days; second defendant's account averaged pre-preference period payments of 74 days, but contested payment during the preference period made 124 days after invoice date; third defendant's account averaged 55 days pre-preference period but payments averaged 109 days during the preference period.).

Peterson contends that this court should look to the range of payment delays in the past, not the average of payment delays, for determining the scope of what was "ordinary" between the parties. *Cf. Jensen v. Raymond Building Supply Corp. (In re Homes of Port Charlotte, Florida, Inc.)*, 109 B.R. 489 (Bankr.M.D.Fla.1990). Peterson's exhibit reveals that of the 132 invoices from the three years encompassing 1982 through 1984 which were paid before the preference period, only five invoice payments, or 3.8%, exceeded 120 days after billing. Late payments exceeding 120 days occurred so infrequently as to represent extraordinary, rather than ordinary, occurrences.

■ Further, based on the testimony from both Century and Peterson, payments to Peterson required not only Peterson's invoices, but also MacFarland making dunning calls to Century for payment. I do not believe the ordinary course of business defense tolerates dunning when the creditor asserts this defense in a preference action. *Cf. Stober v. Florida Steel Corp. (In re Industrial Supply Corp.)*, 109 B.R. 484, 489 (Bankr.M.D.Fla.1990) (although the payment intervals during preference period were not very different from prior period, "extraordinary collection efforts" such as refusing to deliver merchandise removed the payments from the ordinary course exception). *Contra, Levy v. Gatlin (In re Gardner Matthews Plantation Co.)*, 118 B.R. 384 (Bankr.D.S.C.1989).

### Subdivision (c)(2)(C)

■ Peterson also has not established that the payments were made according to "ordinary business terms" as required by subdivision (c)(2)(C). Notwithstanding the perception of the parties, a majority of jurisdictions now agree that "ordinary business terms" in subdivision (C) refers to "an objective standard to be shown by the custom in the industry in which the transferee and debtor are engaged." *In re Loretto Winery, Ltd.*, 107 B.R. 707, 709–10 (9th Cir.BAP 1989).

■ Peterson cannot, and does not, contend that it was an ordinary practice for vendors in Century's and Peterson's industries to make or receive payments four to five months after invoices were rendered, when the invoices stated terms as net cash. Peterson and Century were not involved in a business that shipped and billed seasonally.[1] Furthermore, one must consider that at the time of the payments in issue, only pressuring creditors were being paid while all other creditors received no payments at all. *See*, 2 W. Norton, *Norton Bankr. L. and Prac.* § 32.19 (1981) ("[A] debtor faced with insufficient assets to pay all currently due liabilities may 'ordinarily' elect to pay one creditor in favor of all others, but such

---

1. This may be a relevant concern. During Congressional hearings in 1981, parties claimed that the sporting goods, clothing and toy industries, among others, who shipped and billed seasonally, were discriminated against by the 45–day rule then in effect. *Bankruptcy Reform Act of 1978: Hearings Before the Subcomm. on Courts of the Senate Comm. on the Judiciary*, 97th

Cong., 1st Sess. 250–70 (April 3 and 6, 1981). *See, Crescent Electric Supply Co. v. Gentile (In re Gentile)*, 114 B.R. 192, 194 (Bankr.W.D.Mo. 1990) ("The present wording [of § 547(c)(2)(B) ] was intended by Congress to be an expansion of the strict measure of time … where no one in the particular industry pays until long after delivery.").

payment should not be protected under Code § 547(c)(2)....").

## IV.

### CONCLUSION

The purpose of Code § 547 is to "facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that receive[s] a greater payment than others of his class is required to disgorge so that all may share equally." 4 L. King, *Collier on Bankruptcy* 547.01 (15th ed. 1979).

I conclude that Congress did not intend that the defense contained in § 547(c)(2) to an otherwise avoidable preference should include the circumstances established in this proceeding. Judgment will enter that the plaintiff may avoid the transfers received by Peterson on January 9 and February 7, 1985 and that the plaintiff shall recover from Peterson the sum of $25,-408.94. It is

SO ORDERED.