In re CIS CORPORATION, Continental Information Systems Corporation, et al., Debtor.

James P. HASSETT, as Chapter 11 Trustee of CIS Corporation, Continental Information Systems Corporation, et al., Plaintiffs.

v.

ALTAI, INC., f/d/b/a Altai Hardware Services, Defendant.

Bankruptcy Nos. 89–B–10073(PCB) to 89–B–10084(PCB).
Adversary No. 91–6364A.

United States Bankruptcy Court, S.D. New York.

Nov. 4, 1997.

---

Kirkland & Ellis by Luc A. Despins, New York City, for James P. Hassett trustee of Liquidating Estate.

Ingersoll & Block by Susan G. Braden, Washington, DC, for Altai, Inc.

## MEMORANDUM DECISION GRANTING TRUSTEE'S MOTION FOR SUMMARY JUDGMENT

PRUDENCE CARTER BEATTY, Bankruptcy Judge.

This adversary proceeding was commenced by James P. Hassett as Chapter 11 Trustee (the "Trustee") of CIS Corporation and its related subsidiaries and affiliates ("CIS" or the "Debtors") to recover prepetition payments of $65,796.94 made to Altai, Inc. f/d/b/a Altai Hardware Services ("Altai") for computer related supplies and equipment purchased from Altai on the grounds the payments were recoverable as preferential transfers. Altai filed an answer denying the payments were recoverable as preferential transfers.

The Trustee has made a motion for summary judgment. Altai now admits that the Trustee can satisfy all the elements of Code § 547(b). However, Altai denies that the Trustee is entitled to the judgment he seeks. Altai argues that the court should dismiss this adversary proceeding pursuant to Bankruptcy Rule 7041 and Federal Rule of Civil Procedure 41(b) ("Rule 41(b)") for the Trustee's failure to prosecute this action sooner. Should that request be denied, Altai contends that as a matter of law the payments were made in the ordinary course of business pursuant to Code § 547(c)(2) and therefore can-

not be recovered. Finally, Altai urges that if the court rejects its first two arguments the court should grant it a continuance because of its alleged need to locate witnesses and obtain affidavits to oppose the motion for summary judgment.

For the reasons which follow, the court declines to dismiss this adversary proceeding and grants summary judgment in favor of the Trustee.

## FINDINGS OF FACT

1. On January 13, 1989 (the "Filing Date"), the Debtors filed voluntary petitions in this Court under Chapter 11 of the Bankruptcy Code. The Debtors continued in the management and operation of their businesses and properties as debtors-in-possession for several months. In early fall of 1989, the Creditors' Committee sought the appointment of a Chapter 11 Trustee on the grounds of a number of acts of alleged misconduct and/or mismanagement by the debtors-in-possession. Shortly thereafter, when the Debtors determined not to oppose the appointment, the court ordered the appointment of a Chapter 11 trustee. James P. Hassett was appointed Trustee on October 25, 1989.

2. The court confirmed a Plan of Reorganization (the "Plan") on November 29, 1994. The Trustee had been acting as Chapter 11 Trustee until consummation of the Plan which occurred on December 21, 1994, at which time and by virtue of the confirmed Plan, the Chapter 11 Trustee became Trustee of the Liquidating Estate.

3. On October 22, 1991, the Trustee commenced this adversary proceeding seeking to recover the Payments as preferential transfers under Code §§ 547 and 550.

4. After receiving several extensions, one year later on October 22, 1992 Altai filed its answer. Altai denied that the Debtors were insolvent when the Payments were made. In addition, Altai asserted five affirmative defenses, including one under Code § 547(c)(2), the so-called ordinary course of business defense.

5. After this adversary proceeding was commenced and before it filed its answer,

Altai made a substantial document production to the Trustee.

6. From October 22, 1991 through the filing of the summary judgment motion (the "Motion"), CIS and Altai corresponded by letter at least 23 times. *See* Exhibit A to Affidavit of Carol S. Ennis in Support of Trustee's Response to Altai, Inc.'s Memorandum of Law in Opposition to the Motion ("Ennis Affidavit") dated November 11, 1996 (A.P.Doc. No. 18A)

7. During the period of March 1, 1994 through April 12, 1996, Altai has acknowledged that the parties had two rounds of settlement negotiations. The first took place between March and May of 1994 and the second took place between December 1995 and April 1996. *See* Declaration of Susan G. Braden ("Braden Declaration") dated October 7, 1996 (A.P.Doc. No. 12A).

8. Upon the withdrawal of his last settlement offer in April 1996, the Trustee informed Altai that he intended to file the Motion for summary judgment.

9. On August 16, 1996 the Trustee filed the Motion. Attached as exhibits to the Affidavit of Daphne E. Schmitt in Support of the Motion dated August 12, 1996 (A.P.Doc. No. 9A) ("Schmitt Affidavit") were, *inter alia,* (i) a chart summarizing the payment history between CIS and Altai prior to the preference period ("Exhibit C") and (ii) a chart summarizing the payment history between CIS and Altai during the preference period ("Exhibit D", together with Exhibit C the "Payment History Charts").[1] Altai did not make any submission refuting or analyzing the Payment History Charts.

10. In the regular course of business between CIS and Altai, CIS purchased computer related supplies and equipment from Altai on account. Altai billed CIS at or shortly after it provided such goods or services. According to the terms of each invoice, payment was due upon its receipt (the "Due Date").

11. Historically, CIS made, and Altai accepted, late payment of invoices. Prior to the preference period, from April 22, 1988 through October 12, 1988, CIS paid 102 invoices from Altai on an average of 51 days after the Due Date. Payment was always made by check.

12. In contrast to its customary pre-preference period payment schedule, during the months of November and December 1988 CIS paid a total of eighty-eight (88) of Altai's invoices more than fifty-one (51) days after the Due Date or an average of eighty (80) days after such date.

13. During November 1988, CIS paid nineteen (19) of Altai's invoices, which totaled $42,199.15 (the "November Payments"), more than fifty-one (51) days or average of 99 days after their Due Dates. The November Payments were made by check number 64852 dated November 22, 1988 and check number 64032 dated November 30, 1988. These checks were negotiated and honored on December 1, 1988 and December 6, 1988, respectively.

14. During December 1988, CIS paid sixty-six (66) of Altai's invoices, which totaled $29,999.29 (the "December Payments," collectively with the November Payments, the "Payments"), more than fifty-one (51) days or 65 days after their Due Dates. The December Payments were made with four checks, check number 65307 dated December 2, 1988, check number 65701 dated December 9, 1988, check number 66012 dated December 16, 1988, and check number 66338 dated December 28, 1988. These checks were negotiated and honored on December 12, 1988, December 13, 1988, December 22, 1988 and January 5, 1989, respectively.

15. CIS was insolvent throughout the ninety day preference period which ran from October 15, 1988 through January 12, 1989.[2] As an insolvent entity, CIS' general unse-

---

1. Exhibit A provided copies of the actual checks forwarded to Altai together with copies of the corresponding invoices during the pre-preference period between April 22, 1988 and October 12, 1988. Exhibit B provided copies of the actual checks forwarded to Altai together with the corresponding invoices and purchase orders during the preference period. The invoices were docu-

ments which had been produced by Altai to the Trustee.

2. Although Altai had initially denied the Debtor's insolvency, Altai withdrew that defense in its Post–Hearing Memorandum.

cured creditors would necessarily receive less than 100% of their claims in a chapter 7 distribution.

16. Pursuant to the Plan, unsecured creditors of CIS received approximately 60% of the amount of their unsecured claims. However, only 45% of the amount received was in cash—the balance of 15% was paid through a distribution of shares in the reorganized CIS. The liquidation analysis contained in the Disclosure Statement estimated that unsecured creditors of CIS would have received 47% of their claims in a chapter 7 liquidation.

17. The Motion was originally scheduled to be heard on October 10, 1996, but that date was adjourned by the court and oral argument was heard on November 13, 1996 (the "Hearing").

18. Neither party addressed nor submitted evidence that the debts incurred between the parties were not incurred in the ordinary course of business.

19. Prior to the Hearing, Altai did not submit any admissible evidence for the contention made in its brief that under Code § 547(c)(2)(B) the Payments were made in the ordinary course of business as between CIS and Altai nor did Altai submit any admissible evidence that under Code § 547(c)(2)(C) the Payments were made according to ordinary business terms in the computer leasing industry.

20. Prior to the Hearing, Altai did not submit any evidence, nor did it brief, any facts or issues in connection with the other affirmative defenses it raised in its answer.

21. In support of its motion to dismiss, Altai asserts that in prior hearings, the court warned the Trustee that delays in the prosecution of preference actions would result in their dismissal. Altai's assertion is inaccurate.

22. As the court informed Altai at the Hearing, at hearings on February 16, 1995 and August 23, 1995, the court held status conferences on all matters still pending in the CIS case in order to ascertain when the case could be closed. At these hearings, the court asked the Trustee's counsel to clarify the progress of the 120 preference actions then pending and requested that they be moved along in order to avoid having the court issue orders to show cause why they should not be dismissed for lack of prosecution. No specific reference was made to this action nor was counsel for Altai present at those hearings. Transcript of Hearing of November 13, 1996 (A.P.Doc. No. 21A) at 5, 7. Since that time the Trustee has reduced the number of pending preference actions to 10.

23. At the Hearing, the court also dealt with Altai's motion for additional time under Fed.R.Civ.P. 56(f) ("Rule 56(f)") by allowing Altai additional time to file factual affidavits following the Hearing. In its pre-Hearing submissions, Altai had stated that on October 31, 1988 Altai sold its Hardware Services Division to North Star Universal ("North Star"). The Hardware Services Division encompassed CE Services, Inc., the corporation which actually provided CIS with the goods and services at issue. Altai also stated that on August 23, 1995 the remainder of the company was acquired by Platinum Technology, Inc. ("Platinum") and Altai became a wholly owned subsidiary of Platinum. Braden Declaration at 2. As a result of both of these sales, Altai asserts that many of its documents are not available and that many of the employees with knowledge of the facts and circumstances surrounding the Payments are not currently in Altai's employ. Braden Declaration at 3.

24. Thereafter, Altai submitted a Post–Hearing Memorandum ("Altai's Post–Hearing Memorandum") along with an Affidavit of Douglas T. McLeod ("McLeod Affidavit") dated December 9, 1996 (A.P.Doc. No. 22A). Mr. McLeod ("McLeod") was a former Executive Vice President of CE Services, Inc., a part of Altai's Hardware Services Division.

25. In his Affidavit, McLeod states that in the 12 years prior to becoming an Executive Vice President of CE Services, Inc. he was employed as a Technical Field Engineer at IBM Corporation and then as a Technical Field Engineer and Branch Manager for Control Data Corp., a company which maintained large IBM systems for end users. McLeod Affidavit ¶ 2, 3, 4, 5.

26. In his capacity as Executive Vice President, McLeod states that he was responsible for managing the sale of services to IBM mainframe customers, third party maintenance, and technical operation services such as the installation, deinstallation and feature reconfiguration, equipment refurbishment, cable assembly sales and service and storage. McLeod Affidavit ¶ 5.

27. McLeod states that CIS became a CE Services customer in the early 1980's, and was among CE Services' largest customers. McLeod Affidavit ¶ 6.

28. McLeod states that it was "typical practice in the computer leasing industry for a vendor like CE Services to supply services, parts and labor to a large company like CIS without payment, because usually the vendor had in its possession computer equipment that was being refurbished. If the customer didn't pay, the equipment could always be held as collateral". McLeod Affidavit ¶ 7. Moreover, because the equipment was very expensive, usually costing $1 million or more, McLeod states that "there was no compelling reason to seek payment on a late invoice." *Id.*

29. In addition, McLeod states that as members of the Computer Dealers and Lessors Association (the "CDLA"), both CIS and CE Services were bound by the CDLA Code of Ethics. McLeod Affidavit ¶ 8.

30. Attached as Exhibit A to the McLeod Affidavit is the 1985–86 CDLA Membership Directory. Both CE Services and CIS are listed as members. Also attached as Exhibit A to the McLeod Affidavit is a copy of the CDLA Code of Ethics.[3]

31. McLeod states that "Article 6 of the CDLA's Code of Ethics requires members to conduct their business transaction with each other to facilitate prompt end customer satisfaction. Therefore CE Services routinely provided services and released equipment to its customers, including CIS, without payment, so that they would be in a position to expeditiously service their end customer demands." McLeod Affidavit ¶ 8.

32. McLeod states that he has no specific recollection of any of the CE Services/CIS transactions which are listed in the Exhibits to the Schmitt Affidavit since these transactions took place more than eight years ago. McLeod states that "from the beginning of the relationship, however, CIS was a 'slow pay' customer, *i.e,* CIS typically took over 30 days to pay bills. For this reason it was not unusual for CIS to make late and sporadic payments." McLeod Affidavit ¶ 9.

33. McLeod states that "CIS's 'slow pay' and sporadic payments were tolerated or excused because it was a large and important customer. CE Services was a small company that was pleased to be able to use CIS as a

---

3. The Articles of the Code of Ethics provide:

"Article 1. To maintain and enforce high standards of ethical practices that makes CDLA membership a recognized mark of experience, integrity and competence.

"Article 2. To regard as confidential all information concerning the business and affairs of clients.

"Article 3. To conduct ourselves in a manner which brings credit to and enhances the reputation of our industry.

"Article 4. To publicize our services only in a professional manner, avoiding all conduct, practices and promotion likely to discredit or injury our industry.

"Article 5. To broaden public understanding, and enhance public regard and confidence in the computer dealer/lessor industry so that users will be encouraged to use our services as their primary source.

"Article 6. In keeping with this dedication to principle, CDLA members have further pledged to:

A. Follow through and complete any Agreement made verbally or otherwise to any CDLA member, prospect or client.
B. Conclude the transaction once the member has agreed to either sell, acquire or lease equipment.
C. Honor any offer that has been accepted by a member and/or client as expeditiously as possible after such acceptance.
D. Indicate to any member or prospective client the conditions and terms which he has the authority to conclude.
E. Utilize only one name in any transaction with a prospective client or member. it is considered extremely unethical to negotiate or bid utilizing different or separate corporate names under one control.
F. Not disparage other members by statement or innuendo to prospective clients.
G. Respond to any complaint of violation filed with the Industry Practices Committee and participate in all processes and procedures of that Committee with respect to that complaint."

reference regarding the quality of our work. There were other companies with which CIS could have done business, if CE Services became aggressive about demanding payment." McLeod Affidavit ¶ 11.

34. Finally, McLeod states that he left Altai's employ after Altai sold its Hardware Services Division to North Star and he is currently Vice President and Secretary of North Star's CE Operating Company. McLeod Affidavit ¶ 13.

35. The Trustee filed a Post–Hearing Affidavit in Response to the McLeod Affidavit dated December 19, 1996 (A.P.Doc. 24A) ("Trustee's Post–Hearing Affidavit"). In his Post–Hearing Affidavit, the Trustee states that he has been involved in various capacities with the CDLA and its predecessor, the Computer Lessors Association (the "CLA"), since the CLA was founded in 1967. He states that he has been a director of the CLA and a member of its executive committee and has served as Chairman of the Industry Practices Committee, the group responsible in part for establishing the CLA's Code of Ethics. He states that he has been Chief Executive Officer of five different companies, all of which were members of either the CDLA or the CLA. Finally, he states that he was one of the persons responsible for drafting the CLA's Code of Ethics "which was substantially adopted by the CDLA." Trustee's Post–Hearing Affidavit ¶ 2.

36. The Trustee states that "a principal purpose behind the adoption of the Code of Ethics, and specifically Article 6 [thereof], was to ensure the enforceability of telephonic agreements." The Trustee states that "at the time the CLA's Code of Ethics was adopted (and as is the case today) a significant number of leasing agreements were made telephonically, with conforming agreements to follow. Unfortunately, in many states, such telephonic agreements are not legally enforceable. Prior to the adoption of the CDLA's Code of Ethics, unscrupulous dealers had been able to use this to their advantage. For example, a dealer would place multiple bids with several companies. After reaching a telephonic agreement with one company, the dealer would breach the agreement if it subsequently received a lower bid. Alternatively, a dealers would submit multiple bids to the same company under different names. This would enable the dealer to strategically breach agreements with impunity, because telephonic agreements could not be legally enforced." Trustee's Post–Hearing Affidavit ¶ 4.

37. The Trustee states that CDLA's Code of Ethics was adopted, in part, "to address these problems by providing a code of behavior regulating and validating telephonic agreements. Most importantly, the Code of Ethics provides an enforcement mechanism, providing that violations of the aformentioned rules could result in a disciplinary action and/or expulsion by the CDLA." Trustee's Post–Hearing Affidavit ¶ 5.

38. The Trustee states that "no provision of the CDLA Code of Ethics requires shipping of goods absent timely payment, nor does the CDLA's Code of Ethics address what payment terms are standard in the computer leasing industry." Trustee's Post–Hearing Affidavit ¶ 6. The Trustee states that "during the formation of CLA's original Code of Ethics, it was specifically agreed that certain matters would *not* be covered by the Code of Ethics. In particular, it was agreed that the Code of Ethics did not apply to disputes involving (i) written contractual relationships between companies, or (ii) the collection of receivables. Such disputes, being legal in nature, were to be resolved by parties through available legal channels." *Id.*

39. Altai filed a reply to the Trustee's Post–Hearing Affidavit, dated December 26, 1996, A.P. Doc. 25A ("Altai's Reply"). However, Altai did not submit any additional affidavits in support of its arguments.

## DISCUSSION

*Altai's Motion to Dismiss for Failure to Prosecute*

 Altai seeks dismissal of this adversary proceeding pursuant to Rule 41(b) on the grounds of the Trustee's alleged failure to prosecute. Rule 41(b) provides that "for failure of the plaintiff to prosecute * * *, a defendant may move for dismissal of an action or of any claim against the defendant.

Unless the court in its order otherwise specifies, a dismissal under this subdivision * * * operates as an adjudication on the merits."

The decision whether to dismiss a complaint for want of prosecution lies within the court's discretion. *See e.g., Minnette v. Time Warner*, 997 F.2d 1023, 1027 (2d Cir. 1993); *Peart v. City of New York*, 992 F.2d 458, 461 (2d Cir.1993). In exercising this discretion the court's consideration is guided by five factors: (i) the duration of the plaintiff's failures; (ii) whether plaintiff had notice that further delays would result in dismissal; (iii) whether the defendant is likely to be prejudiced by further delay; (iv) a balancing of the need to alleviate court calendar congestion with a party's right to due process; and (v) the efficacy of lesser sanctions. *Nita v. Connecticut Dept. of Envtl. Protection*, 16 F.3d 482, 485 (2d Cir.1994); *Merker v. Rice*, 649 F.2d 171, 174 (2d Cir.1981).

The Second Circuit has stated, however, that dismissal for lack of prosecution is "a harsh remedy to be utilized only in extreme situations." *Alvarez v. Simmons Market Research Bureau, Inc.*, 839 F.2d 930, 932 (2d Cir.1988) (*quoting Theilmann v. Rutland Hospital, Inc.*, 455 F.2d 853, 855 (2d Cir.1972)); *Merker*, 649 F.2d at 173 ("dismissal for failure to prosecute is 'an especially drastic remedy, reserved for rare occasions.' "). Indeed, so harsh is this remedy that there is a "general reluctance in [the Second Circuit] to employ the Rule 41(b) dismissal absent intentional misconduct." *In re East River Restaurant Assoc., Inc.*, 137 B.R. 118, 120 (Bankr.S.D.N.Y.1992). Moreover, the "passage of time alone does not dictate dismissal of an action for want of prosecution." *Patterson v. Newspaper and Mail Deliverers' Union of New York and Vicinity*, 884 F.Supp. 869 (S.D.N.Y.1995); *SEC v. Everest Management Corp.*, 466 F.Supp. 167, 172 (S.D.N.Y.1979).

Altai asserts that for the 41 months between the filing of Altai's answer on October 22, 1992 and the Trustee's filing of the instant Motion on August 16, 1996, the Trustee took no steps to prosecute its claims against Altai. Altai argues that it has been prejudiced by this delay since it was acquired by Platinum during that period and documents and former employees with relevant information can no longer be located. No affidavit establishing what relevant information cannot be located has been submitted. All invoices and checks are available either because they were in the Trustee's files or because Altai had earlier produced them to the Trustee who had preserved them. *See* Finding 9. Reduced to basics, Altai relies on the mere passage of time and the absence of any formal action taken in the court in seeking dismissal for lack of prosecution.

During the period between the filing of the adversary proceeding and the filing of the Motion, the Trustee documents not less than 23 written communications and two rounds of settlement negotiations between the parties. These undisputed facts rebut any allegation of inaction constituting sufficient lack of prosecution to warrant dismissal. It is clear that once the parties' settlement positions became intractable, the Trustee filed the Motion. Rather than revealing a clear record of delay, the record here discloses a positive and earnest movement toward resolution of the dispute. *GCIU Employer Retirement Fund v. Chicago Tribune Co.*, 8 F.3d 1195, 1200 (7th Cir.1993).

Moreover, at no time during the 41 month period prior to the filing of the Trustee's Motion did Altai move to have this proceeding dismissed for lack of prosecution. Courts in this Circuit have held that one party's failure to inform the court about another party's delay is significant and "may be considered as a factor in informing the court's discretion." *Finley v. Parvin/Dohrmann Co.*, 520 F.2d 386, 392 (2d Cir.1975); *SEC v. Everest Mgmt. Corp.*, 466 F.Supp. at 171; *accord Acot v. New York Medical College*, 153 F.R.D. 517, 520 (S.D.N.Y.1993); *Knight v. H.E. Yerkes and Assoc., Inc.*, 135 F.R.D. 67, 70–71 (S.D.N.Y. 1991).

Finally, Altai has asserted that the court had warned the Trustee in other CIS proceedings that delays in the prosecution of preference actions could result in their dismissal. As the court informed Altai at the Hearing, this assertion is inaccurate. *See* Findings 21 and 22. Merely asking the

Trustee for the status of pending preference actions and directing the resolution of these matters "as quickly as possible" is not the equivalent of a warning that dismissal of a particular adversary proceeding is imminent.[4] *See Patterson*, 884 F.Supp. at 873.

■ Dismissal with prejudice is an extreme sanction, appropriate only when there is a clear and unambiguous record of delay.[5] There is no such record presented here. The lack of prejudice suffered by Altai, its failure to make any motion for dismissal prior to this defensive response to the Motion and the Trustee's explanation for the delay in filing the Motion are all relevant factors which inform the exercise of the court's discretion. Upon considering these factors and the circumstances surrounding the delay, the court holds that dismissal of this action for want of prosecution is not appropriate.

*Rule 56(f)*

■ In its pre-Hearing Memorandum of Law in Opposition to the Motion, Altai stated that it required additional time to locate witnesses and obtain affidavits which would have information giving rise to genuine issues of material fact.[6] This court allowed

Altai additional time following the Hearing to submit any affidavits it desired. It submitted only one, the McLeod Affidavit.

Rule 56(f) provides:

"Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order is as just."

■ Rule 56(f) is intended as a safeguard preventing a *premature* grant of summary judgment against a party without access to the facts necessary to justify opposition to the movant's affidavit. *In re Bell & Beckwith*, 112 B.R. 863, 868 (Bankr. N.D.Ohio 1990). However, Rule 56(f) may not be used as a delaying tactic. Consequently "a request for relief under Rule 56(f) is extremely unlikely to succeed when the party seeking the delay has failed to take advantage of discovery." *Id., quoting*, 10A Charles Alan Wright, Arthur R. Miller,

---

4. As a matter of prudent policy chapter 11 trustees and debtors-in-possession frequently defer filing or prosecuting preference actions until at or close to confirmation. Code § 546(a)(1) provides that trustees must file adversary proceedings within two years of their appointment. In *In re Century Brass Products, Inc.*, 22 F.3d 37 (2d Cir.1994), the Second Circuit held that debtors-in-possession must file adversary proceedings within two years of becoming debtors-in-possession. Before confirmation it is difficult to determine how much creditors will receive under a plan or whether a plan can be confirmed at all. Nor can it easily be determined whether the greater percentage test of Code § 547(b)(5) will be met. With respect to at least smaller preference actions, settlements frequently take into account the likely distribution under the plan. Once a creditor repays a preference, it has an allowable claim. *See* Code § 502(d). Thus, the parties will often settle on a net basis.

5. Altai has cited several cases in support of its motion, each of which the court finds factually distinguishable. In *Lyell Theatre Corp. v. Loews Corp.*, 682 F.2d 37, 43 (2d Cir.1982) the Second Circuit found that dismissal was warranted because the plaintiff repeatedly missed *court-imposed* discovery deadlines and scheduled trial conferences, sought numerous extensions and failed to produce requested documents. In *Luk-

*ensow v. Harley Cars of New York*, 124 F.R.D. 64 (S.D.N.Y.1989), the district court dismissed an action for failure to prosecute after the plaintiff failed to file a response to a summary judgment motion. This dismissal followed a complete lack of prosecutorial effort on the part of the plaintiffs for two years, their failure to contact counsel for five months prior to his withdrawal, the court's inability to get an address for the plaintiffs and the inefficacy of any other sanction in light the fact that the court could not contact the plaintiffs. In *M & H Cosmetics, Inc. v. Alfin Fragrances, Inc.*, 102 F.R.D. 265, 266 (E.D.N.Y. 1984), the plaintiffs failed to respond to numerous discovery requests, asserting excuses such as "secretarial and post office error" which delays caused the plaintiffs to miss a *court-imposed* discovery deadline. Finally, in *Charles Labs, Inc. v. Banner*, 79 F.R.D. 55 (S.D.N.Y.1978) a proceeding was dismissed when the plaintiff merely filed a complaint and did nothing in the case for 18 months.

6. The court notes that it is a bit illogical for Altai to move both to dismiss for lack of prosecution because of the length of time the adversary proceeding has been pending and to seek additional time to respond to the Motion.

Mary Kay Kane, Federal Practice and Procedure, § 2741 at 553 (1983). *See also, Burlington Coat Factory Warehouse v. Esprit De Corp.,* 769 F.2d 919, 926 (2d Cir. 1985).

As Altai itself has admitted, in April of 1996, more than four months before the Trustee actually filed this Motion, the Trustee informed Altai that he would move for summary judgment. Altai has not indicated why the records in the Trustee's possession are insufficient. Altai also does not state why it was unable to locate witnesses and prepare affidavits during that time, nor what steps it took to do so. By the time this matter was heard in November 1996, the court had already adjourned the scheduled Hearing for one month which should have provided Altai with the additional time it states it needed to locate witnesses. After the Hearing, the court allowed Altai yet further time. All told, Altai had four months before the filing of the Motion, two months after it was filed and yet further time after the Hearing to gather its witnesses and evidence. This court concludes that the consideration of the Motion is not premature or otherwise inappropriate at this time. Altai is not entitled to any additional time to submit its opposition to the Motion. *See King v. Nat'l Indus., Inc.,* 512 F.2d 29, 34 (6th Cir. 1975) ("plaintiff's expressions of surprise carry a hollow ring"). Accordingly, Altai's Rule 56(f) motion to the extent still pending is denied.

*Summary Judgment Standards*

Rule 56, as made applicable to adversary proceedings by Bankruptcy Rule 7056, provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus., Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

A fact is material only if it affects the result of the proceeding and a fact is in dispute only when the opposing party submits evidence such that a trial would be required to resolve the differences. *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976); *In re Tikijian,* 76 B.R. 304, 313 (Bankr.S.D.N.Y.1987). The court's function when faced with a motion for summary judgment is to determine whether there exist any genuine issues of material fact to be tried, and not to resolve any factual disputes. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. at 2510–11; *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996); *Schering Corp. v. Home Insurance Co.,* 712 F.2d 4, 9 (2d Cir. 1983); *In re Ross,* 64 B.R. 829, 836 (Bankr. S.D.N.Y.1986).

In ruling on a motion for summary judgment, the court is required to draw all factual inferences in favor of, and take all factual assertions in the light most favorable to, the party opposing summary judgment. *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 36 (2d Cir.1994). If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with affidavits, depositions, or other sworn evidence setting forth specific facts showing that there exists a genuine issue of material fact. *Rule,* 85 F.3d at 1011; *accord* Rule 56(e). However, the nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355–56. Instead, the nonmovant must "come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely * * * on the basis of conjecture or surmise." *Trans. Sport v. Starter Sportswear,* 964 F.2d 186, 188 (2d Cir.1992) (citation omitted).

Moreover, the evidence favoring the nonmoving party must be more than merely colorable. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11. A mere scintilla of evidence is not enough to create a genuine issue of fact. *Id.* at 252, 106 S.Ct. at 2512. There must be evidence upon which a jury may reasonably rely; and a party may not escape summary judgment on the mere hope that

something will turn up at trial. *Id.; Ayers v. Pastime Amusement Company*, 283 F.Supp. 773, 793 (D.S.C.1968); *In re General American Communications Corporation*, 63 B.R. 534 (Bankr.S.D.N.Y.1986).

■ Finally, where the nonmoving party bears the burden of proof on an issue at trial, the moving party may simply point to the absence of evidence to support the nonmoving party's case. *National Lumber and Supply, Inc.*, 184 B.R. 74, 79 (9th Cir. BAP 1995); *In re Brazier Forest Products, Inc.*, 921 F.2d 221, 223 (9th Cir.1990).

### Altai's Affirmative Defenses

Altai has conceded, with the withdrawal of the dispute over the Debtors' solvency, that the Trustee can satisfy all of the elements of Code § 547(b) and establish that the Payments are preferences.[7] What remains are Altai's affirmative defenses.

Although Altai's answer asserted five affirmative defenses, since Altai has only briefed and argued one of them, the remainder must be considered to have been abandoned.[8] The only affirmative defense to be considered is the ordinary course of business defense under Code § 547(c)(2). Affirmative defenses plead matters extraneous to the plaintiff's prima facie case, which deny the plaintiff's right to recover even if the allegations in the complaint are true. *In re National Lumber*, 184 B.R. 74(an avoidance that meets the conditions of Code § 547(b) can still be barred by Code § 547(c), which provides exceptions to the trustee's avoiding powers).

### The Ordinary Course of Business Defense

Code § 547(c)(2) provides that an otherwise avoidable preferential transfer may not be avoided to the extent that the transfer was—

"(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; and

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms."

■ Altai bears the burden of proving each of the three enumerated elements by a preponderance of the evidence. Code § 547(g) ("the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c)"). *See also In re Roblin*, 78 F.3d 30, 39 (2d Cir.1996); *In re CIS Corporation*, 195 B.R. 251, 257 (Bankr.S.D.N.Y.1996); and *In re Deltacorp, Inc.*, 179 B.R. 773 (Bankr. S.D.N.Y.1995). Because of the important policies served by preference law, courts have repeatedly held that the exceptions contained in Code § 547(c), including the ordinary course of business exception, "should be narrowly construed." *In re CIS Corpora-*

---

7. Code § 547(b) provides:
"[e]xcept as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
(A) on or within ninety days before the date of the filing of the petition; or
(B) between ninety days and one year before the date of the filing of the petition, if such creditor was an insider; and
(5) that enables such creditor to receive mote than such creditor would receive if—
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such debt to the extent provided by the provisions of this title."

8. Altai did make reference to its affirmative defense under Code § 547(c)(1) stating that the exhibits attached to the Schmitt Affidavit do not evidence "all the facts and circumstances about * * * the contemporaneous exchange of new value." Altai's Response to Trustee's Local Bankruptcy Rule 7056–1 Statement dated October 7, 1996 (A.P. Doc 13A). However, Altai has not submitted any affidavits or other evidence in support of this defense to establish that there is a genuine issue for trial. *See* Rule 56(e) ("an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not respond, summary judgment, if appropriate, shall be entered against the adverse party").

*tion,* 195 B.R. at 257; *In re Writing Sales Limited Partnership,* 96 B.R. 175, 178 (Bankr.E.D.Wis.1989); *In re First Software Corp.,* 81 B.R. 211, 213 (Bankr.D.Mass.1988) (citing cases)

■■■■ In considering an ordinary course of business defense under Code § 547(c)(2), it has been held that the court should examine several factors, including the prior course of dealing between the parties, the amount of the payments in question, the timing of the payments and the circumstances surrounding the payments. *CIS,* 195 B.R. at 258. To meet its burden, Altai must demonstrate that the transfers were both subjectively and objectively ordinary. *Id.* To be subjectively ordinary as between the parties implies some consistency with other business transactions between the debtor and the transferee. *Id.* To be objectively ordinary implies that the subject transfers fall "within the bounds of ordinary practice of others similarly situated" in the industry. *In re Roblin,* 78 F.3d at 41.

Neither party disputes that the debt was incurred in the ordinary course of business. Therefore the court finds that Code § 547(c)(2)(A) has been satisfied.

*The Payments Were Not Subjectively Ordinary as Between the Parties*

■■■■ The court first considers whether Altai has established that the Payments were made in the ordinary course between CIS and Altai as required by Code § 547(c)(2)(B). In reviewing the prior course of dealing between the parties, the court may look to the timing of the preferential payments as compared to the historical timing of payments prior to the preference period. *In re Century Brass Products, Inc.,* 121 B.R. 136, 138 (Bankr.D.Conn.1990). If the preferential payments were made within the time period set by the historical pre-preference course of dealings, then the preference payments can be said to have been made within the ordinary course of business between the parties. *Id.; In re Global Distrib. Network, Inc.,* 103 B.R. 949, 954 (Bankr.N.D.Ill.1989); *Writing*

*Sales,* 96 B.R. at 181; *First Software,* 81 B.R. at 213–14; *In re Xonics Imaging, Inc.,* 837 F.2d 763, 766 (7th Cir.1988).

■■■■ The unrefuted evidence presented in the Payment History Charts establish the historical payment schedules between CIS and Altai both prior to and during the preference period. Specifically, during the four months prior to the commencement of the preference period, CIS paid Altai, on average,[9] fifty-one (51) days after the Due Date. During the preference period, the Payments were made, on average, eighty (80) days after the Due Date. This is not a trivial difference. CIS's payments to Altai were made almost a month later during the preference period than they had been during the pre-preference period.

Altai has offered no independent analysis of the invoices. Its contention is that the court should look to the range of payment dates in the past, not the average of payment dates, for determining the scope of what was ordinary between the parties. Altai points out that in the pre-preference period three invoices were paid at 112, 142 and 189 days respectively. Since this is far beyond the 51 day average during the pre-preference period, Altai argues that the preference period payments were consistent with prior late payments and thus in the ordinary course of business between the parties.

The court disagrees. Three unusually late payments out of 102 do not establish a course of conduct. Moreover, the delay is sufficiently out of character that it could have been caused by any number of reasons, including a dispute over those invoices or the misplacing of them for a period of time. They are merely a minor aberration in the prior payment history and certainly do not rise to the level of establishing what was ordinary, or usual, between the parties. *See Century Brass* 121 B.R. at 138. Taking the average payment schedule between the parties both prior to and during the preference period, in essence, weeds out these types of unusual or

---

**9.** The average payment period was determined by adding the total number of days between invoice dates and payment and dividing the sum by the number of invoices. All average time periods, both prior to and during the preference period have been computed in this manner. *Global,* 103 B.R. at 954; *First Software,* 81 B.R. at 213.

irregular payments from the calculation. While Altai disagrees with the "average lateness" computation theory for determining the scope of what was ordinary between the parties, it has not cited any case law in support of any alternate legal theory.

It was incumbent on Altai to present evidence sufficient to meet its burden of proof on this issue and/or to make a persuasive argument for the adoption of an alternative legal theory. Altai has failed to do either. The court therefore finds that the Payments were not made in the ordinary course of business as between CIS and Altai under Code § 547(c)(2)(B).

*Altai Has Failed to Establish that the Payments Were Made According to Ordinary Business Terms In the Computer Leasing Industry*

▪ Although Altai has failed to meet its burden of proof as to Code § 547(c)(2)(B), the court will nonetheless go on to consider the showing Altai has made under Code § 547(c)(2)(C). Pursuant to Code § 547(c)(2)(C), Altai's burden is to establish that the Payments were within the bounds of ordinary practice of others similarly situated in the computer leasing industry. The only evidence presented by Altai to address the ordinary practice of others in the computer leasing industry is that contained in the McLeod Affidavit. *See* Findings 24 through 34.

In the instant case the court finds that the McLeod Affidavit provides no sufficiently probative evidence for Altai's contention that the Payments were made according to ordinary business terms. Rule 56, by its very terms, provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. The duty of the court at this juncture is not to determine the truth of the matter or to resolve issues of fact, but to determine whether such genuine and material issues are present. If the evidence submitted by the party opposing summary judgment is merely colorable or is not significantly probative, summary judgment may be granted. *Id.* The court can consider the content of all

submitted affidavits in determining whether a proponent's affidavit is sufficient to give rise to a dispute as to a material issue of fact. Rule 56(e).

The central assertion in the McLeod Affidavit is that the CDLA Code of Ethics governs the practices and agreements among its members. The threshold decision on the interpretation of the CDLA Code of Ethics is an issue of law, not fact, whose determination is the exclusive province of the court, as is the determination as to whether the CDLA Code of Ethics does, in fact, govern computer leasing industry agreements. *See Dale Carnegie & Associates, Inc. v. Thomas,* 1993 WL 330457, p. *2 (S.D.N.Y.1993); *In re Hooker,* 145 B.R. 138, 143 (Bankr.S.D.N.Y.1992). While both McLeod and the Trustee have put forth differing interpretations of the CDLA Code of Ethics, the CDLA Code of Ethics is a writing which the McLeod Affidavit implies should be deemed a part of any contract between the parties.

The Second Circuit has held that summary judgment is appropriate when the issue is a contract's proper construction so long as the words convey a definite and precise meaning absent any ambiguity. *Lazard Freres v. Protective Life Insurance Company,* 108 F.3d 1531 (2d Cir.1997). A writing is unambiguous when, construing as a whole and giving each section its plain meaning, the writing is readily susceptible to only one interpretation. *Dale Carnegie,* p. *2. If a writing is clear and unambiguous on its face, its meaning must be determined from the four corners of the instrument without resort to extrinsic evidence. *In re Kam Kuo Seafood Corporation,* 76 B.R. 297, 301 (Bankr. S.D.N.Y.1987); *See also Goodheart Clothing Company, Inc. v. Goodman Enterprises, Inc.,* 962 F.2d 268, 272 (2d Cir.1992) (plain meaning should govern the interpretation of the agreement without resort to extrinsic evidence of any nature).

In the instant case, a plain reading of the CDLA Code of Ethics finds it to contain no provisions relating to usual or customary payment terms in the computer leasing industry. In fact, the CDLA Code of Ethics does not even address this issue. Therefore, the court finds as a matter of law that the

CDLA Code of Ethics does not establish that the Payments were within the bounds of ordinary practice of others similarly situated in the computer leasing industry.

Altai has also relied on the McLeod Affidavit in arguing that there is no single or uniform set of business terms in the computer leasing industry. Altai's Reply, p. 3.; *See* McLeod Affidavit ¶ 7. The McLeod Affidavit actually does not support that statement and cuts against Altai's argument that the Payments were made within the bounds of ordinary practice of others in the computer leasing industry because it indicates that 30 days is a point of reference to the determination of industry standards. The Trustee's unrefuted evidence established that CIS paid its bills an average of 51 days after the Due Date in the pre-preference period and an average of 80 days after the Due Date during the preference period.

However, even if the McLeod Affidavit is read in the more favorable light urged by Altai, nothing asserted by McLeod in the Affidavit establishes that the range of payment terms in the computer leasing industry varies from season to season. In other words, nothing in the McLeod Affidavit justifies by reference to industry standards the marked change in average lateness from the pre-preference period to the preference period.

Finally, the court finds that none of the other statements in the McLeod Affidavit give rise to any probative assertion as to the ordinary payment practice of others the computer leasing industry.[10] *See* McLeod Affidavit ¶ 9.

It was incumbent on Altai to present evidence sufficient to meet its burden of proof on this issue. Altai has failed to do so. Accordingly, the court finds that the Payments were not made within the bounds of ordinary practice of others similarly situated in the computer leasing industry under Code § 547(c)(2)(C).

---

10. The McLeod Affidavit also stated that CIS was a "slow pay customer" which "typically took over 30 days to pay bills." McLeod Affidavit ¶ 9. The court notes that it is unclear whether this assertion is intended to establish the ordinary

## CONCLUSION

For the reasons set forth above, the court finds that Altai has failed to meet its burden of proof on any of its affirmative defenses and it has failed to submit any evidence which raises an issue of triable fact.

Accordingly, the Trustee's Motion for Summary Judgment is granted.

Altai's motion to dismiss for failure to prosecute pursuant to Rule 41(b) is denied.

Altai's motion for additional time to locate witnesses and prepare affidavits pursuant to Rule 56(f) is also denied.

Settle order.

course of business as between Altai and CIS under Code § 547(c)(2)(B) or to establish the ordinary practice of others in the computer leasing industry under Code § 547(c)(2)(C).